

**In The**
**Court of Appeals**
**Sixth Appellate District of Texas at Texarkana**

_____

No. 06-12-00067-CV
_____

TEXARKANA NURSING & HEALTHCARE CENTER, LLC, Appellant

V.

SUSAN LYLE, INDEPENDENT GUARDIAN OF BETTY RUTH VEST, Appellee

On Appeal from the 202nd Judicial District Court
Bowie County, Texas
Trial Court No. 11C1230-202

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

O P I N I O N

I.    Background

Betty Ruth Vest was a resident of Texarkana Nursing & Healthcare Center, L.L.C. (Texarkana Nursing) from 2003 until September 2011, when she passed away.[1]  From the time of her admission, Vest was dependent on the nursing home staff for all of her care.  It is alleged that on July 31, 2009, while under the care of the Texarkana Nursing staff and while receiving hospice care, Vest was assaulted by Mary Bean, an L.V.N. employed by Texarkana Nursing. The assault allegedly left scratches on Vest's forehead, cuts on her left leg, knots on the sides of her head, and caused bruising and swelling of her left eye.  Vest recovered from the assault.[2] Bean was arrested and charged with assault.

In July 2011, Susan Lyle, Vest's daughter and independent guardian, sued Texarkana Nursing[3] alleging Vest was assaulted by Bean in July 2009 and was injured as a result.  Lyle pleads that the claims "by Plaintiff against Defendants fall within the scope of Chapter 74 of the Texas Civil Practice and Remedies Code."  This assertion is incorporated into each theory of liability thereafter set forth in the petition.  Lyle claims Texarkana Nursing is vicariously liable for the alleged negligence of its employees.  Lyle further alleges Texarkana Nursing was directly responsible for the assault due to negligent supervision, negligent hiring, failure to hire and

---

[1]Lyle died in September 2011, after the petition was filed in July 2011.

[2]While Lyle does not claim Vest died as a result of the assault, the prayer for relief is phrased in terms of the "wrongful death beneficiaries of BETTY RUTH VEST."

[3]Ann Yeager Ellisor (the nursing home administrator) was also a named defendant in the lawsuit. The claim against Ellisor was nonsuited.

2

provide sufficient staff, and failure to allocate sufficient financial resources to the facility. The petition also alleges a direct negligence claim against Texarkana Nursing based on the failure to provide a safe environment for its residents.

Lyle provided an expert report from Milton D. Shaw, M.D., C.M.D.[4] In response, Texarkana Nursing filed a motion to dismiss for failure to provide an adequate expert report in accordance with Section 74.351(a) and (b) of the Texas Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a), (b) (West 2011). The trial court denied the motion to dismiss. On appeal of this interlocutory order, Texarkana Nursing alleges that (1) the trial court erred in denying its motion to dismiss Lyle's direct liability claims, and (2) the trial court erred in denying its motion to dismiss Lyle's vicarious liability claims.

## II. Applicable Law and Standard of Review

Chapter 74 of the Texas Civil Practice and Remedies Code requires a health care liability claimant to serve on each party one or more expert reports, together with a curriculum vitae of each expert, no later than 120 days after the original petition is filed. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a). An expert report is

> a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

---

[4]Shaw is board certified in internal medicine and is certified by the American Medical Directors Association as a medical director. Shaw is the medical director of the geriatrics and extended care program at the Veterans Administration (VA) Hospital in Kerrville and is assistant clinical professor of medicine at the University of Texas Medical School at San Antonio. Shaw is the medical director of two private community nursing homes in Kerrville, separate from his VA practice.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (West 2011). A motion to dismiss is properly granted if it appears that the report does not represent a good-faith effort to comply with subsection (r)(6) or is not sufficiently specific "to provide a basis for the trial court to conclude that the claims have merit." *Am. Transitional Care Ctrs. of Tex.*, *Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). A report that merely states the expert's conclusions regarding the standard of care, breach, and causation is deficient. *See Palacios*, 46 S.W.3d at 879. "[T]he expert must explain the basis of his statements to link his conclusions to the facts." *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam). A motion challenging the adequacy of an expert report shall be granted if the report "does not represent an objective good faith effort to comply" with the statutory definition of an expert report. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l) (West 2011). A "good faith effort" is one that (1) provides information sufficient to inform the defendant of the specific conduct called into question and (2) enables the trial court to conclude the claims have merit. *Wright*, 79 S.W.3d at 52.

We review a trial court's ruling on a motion to dismiss for an abuse of discretion. *Id.*; *Goforth v. Bradshaw*, 296 S.W.3d 849, 851 (Tex. App.—Texarkana 2009, no pet.). A trial court abuses its discretion when it acts arbitrarily or unreasonably or without reference to any guiding rules or principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003). A trial court has no discretion, however, in correctly analyzing and applying the law. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992).

4

### III. Analysis

#### A. Shaw's Report is Deficient, but Not Silent, with Respect to Direct Liability Claims

Texarkana Nursing argues that Shaw's report is silent with respect to the pled claims of direct liability. Texarkana Nursing characterizes the categories of direct negligence listed in the petition as negligence in hiring, staffing levels, supervision of personnel, provision of financial resources, and failing to comply with the Code of Federal Regulations.[5]

Shaw's report states that Vest "was assaulted by Mary Ann Bean, an L.V.N. at the nursing facility, resulting in injuries to Mrs. Vest, including a 1 inch scratch to the forehead, bilateral contusions with swelling to the forehead, left periorbital ecchymosis, and contusion with ecchymosis to the left lower leg."[6]

The report includes one paragraph addressing the standard of care, as follows:

> The standard of care for a long term care facility and its staff requires that the facility in question provide that level of care and treatment that a reasonable, prudent, similar facility would provide under the same or similar circumstances. The facility must provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial wellbeing possible. To do

---

[5]The allegations fall variously under the categories listed in the petition as "Negligence," "Negligence Resulting in Health Care Liability Claims," "Negligence Per Se," and "Violation of Penal Code § 22.04." Pled claims include: the failure to allocate sufficient financial resources to Texarkana Nursing for residents' needs to be met, resulting in the mistreatment, abuse, and neglect of Vest; the failure to use reasonable care in treating residents with the degree of skill and learning ordinarily possessed and used by nursing home facilities in the same or similar locality; the failure to assist all residents, including Vest, in attaining and maintaining the highest practicable level of physical, mental, and psychosocial well-being; the failure to properly supervise nurses and aides; the failure to provide sufficient nurses and aides; the failure to ensure that Vest received timely and accurate care assessments and necessary supervision; various violations of the Code of Federal Regulations; and violation of Section 22.04 of the Texas Penal Code (injury to elderly individual). TEX. PENAL CODE ANN. § 22.04 (West Supp. 2012).

[6]Ecchymosis is "[t]he passage of blood from ruptured blood vessels into subcutaneous tissue, marked by a purple discoloration of the skin." *Ecchymosis Definition*, TheFreeDictionary.com, http://www.thefreedictionary.com/ecchymosis (last visited Dec. 10, 2012).

5

so also requires that the nursing facility provide a safe environment for its residents, insofar as it is possible.

Shaw further opines:

> In the case of Ms. Vest, Texarkana Nursing and Healthcare Center clearly did not provide a safe and secure environment for its residents, allowing the documented assault of Ms. Vest by one of its own employees. In this regard, Texarkana Nursing and Healthcare Center breached its responsibility to Ms. Vest and her family, resulting in injury to the resident.

Shaw concludes that "Texarkana Nursing and Healthcare Center failed to provide a safe environment for Ms. Vest, resulting in her assault and injury at the hands of an employee of the facility."

### (1)     Standard of Care and Breach

Even though our analysis is confined to the four corners of the report, the report must be read in conjunction with the pleadings to determine if it provides a basis for Lyle's claims. *See Palacios*, 46 S.W.3d at 878. The report states that the applicable standard of care requires Texarkana Nursing to "provide the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial wellbeing possible." This standard includes, insofar as it is possible, the duty to "provide a safe environment for . . . residents." Shaw opines that Texarkana Nursing breached the standard of care by allowing the "documented assault on Ms. Vest by one of its own employees." The resulting injuries are listed in the report.

Texarkana Nursing initially takes issue with Shaw's opinion addressing the need to provide Vest with a "safe environment" because it is not a pled claim. Even though not pled in this precise language, the petition alleges a breach of the nondelegable duty to assist Vest in

6

attaining and maintaining "the highest practicable level of physical, mental, and psychosocial well being." As Shaw opines, the provision of a safe environment is required in order to fulfill this duty. *See Harris Methodist Fort Worth v. Ollie*, 342 S.W.3d 525, 527 (Tex. 2011) (per curiam) ("services a [health care provider] provides its patients necessarily include those services required to meet the patients' fundamental needs such as . . . safety").

Texarkana Nursing further complains of the inadequacy of the stated standard of care, because it does not indicate what Texarkana Nursing should have done differently, citing *Russ v. Titus Hospital District*, 128 S.W.3d 332, 341–42 (Tex. App.—Texarkana 2004, pet. denied) ("[w]hether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently") (quoting *Palacios*, 46 S.W.3d at 880).[7] In other words, one must be able to determine from the report what was required by the standard of care. This requires "specific information about what the defendant should have done differently." *Palacios*, 46 S.W.3d at 880. Here, we have a generic statement that the nursing facility must provide a safe environment. Texarkana Nursing maintains this is insufficient.

Conversely, Lyle contends that the report meets the criteria set out in Chapter 74. According to Lyle, the report sets forth the standard of care, requiring the facility to provide the level of care and services necessary for Vest to maintain and attain the highest level of well-

---

[7]*Russ* involved an allegedly deficient report regarding a hospital's duty to keep a suicidal patient from injuring herself. In that case, the patient sustained injuries from a fall out of a hospital window. This Court held that the statement "that windows [must] either be secured with metal screens that only staff can open, or be locked" or, "[i]f the patient has access to the window, a special difficult to break glass or Plexiglass should be used" was sufficient to apprise the hospital of what it should have done differently in light of the fact that the hospital placed the patient in a fourth-floor room with unlocked windows. *Russ*, 128 S.W.3d at 342.

7

being possible, thus necessitating the provision of an environment safe for residents. Lyle defends the breach and causation sections of the report in reliance on *UHS of Timberlawn*, *Inc. v. S.B. ex rel. A.B.*, 281 S.W.3d 207 (Tex. App.—Dallas 2009, pet. denied). In that case, a thirteen-year-old patient at Timberlawn's psychiatric treatment facility was placed in a ward with male patients, where one of them allegedly raped her. The patient claimed her injuries were proximately caused by the negligence of Timberlawn's employees and submitted an expert report in support of her claims. Timberlawn claimed the report was inadequate and conclusory on the issue of causation. This complaint was based on the premise that the expert did not opine that the patient was actually raped, and, thus, could not identify the alleged causal relationship between Timberlawn's alleged negligence and the patient's injury. In rejecting this premise, the court distinguished health care liability claims in which "the 'injury, harm, or damages claimed' flow from the existence of a medical condition that itself resulted from the breach of the applicable standard of care." *Id*. at 212. In such a case,

> [I]dentifying the causal relationship between the alleged breach of the standard of care and the resulting harm involves not only an explanation as to how the standard of care was breached, but also how the breach gave rise to the new, deleterious medical condition. Similarly, other healthcare liability claims may allege that a breach of the applicable standard of care exacerbated a pre-existing medical condition, or hindered or prevented the effective treatment of such a condition. Identifying the "breach/injury" causal relationship in these cases may well require an expert to opine as to the existence, extent, and prognosis of the pre-existing medical condition, as well as how the alleged breach of the standard of care aggravated such a condition, impeded or prohibited its treatment, and otherwise affected the patient's prognosis.
>
> However, S.B.'s claim is different. S.B. alleges that, as a result of Timberlawn's failure to meet the applicable standards of care relevant to its treatment of her, she was raped. Rape is not a medical condition. It is an assault. Moreover, rape may

8

-- or may not -- be accompanied by medically ascertainable evidence of physical trauma, or even physical evidence that it occurred.

*Id.* The court, therefore, declined to hold that the causation element of the report was required to include an opinion that the patient was in fact raped. *Id.*

This case is different from *Timberlawn* inasmuch as Texarkana Nursing is not claiming that the report fails to state that Vest was, in fact, assaulted. There is no dispute that Vest was assaulted; the assault was photographically documented.[8] Instead, Texarkana Nursing claims the mere statement that it failed to provide a safe environment is an insufficient statement of the breach of the standard of care, because it does not indicate what should have been done differently. In contrast, the *Timberlawn* report stated that housing the patient

> in the male unit exposed [the patient] to harm which resulted in her self reported rape. Had [S.B.] been housed in a safe and appropriate manner, given her propensity for sexual victimization, she would not have been placed in a male unit. By being housed in a male unit it was foreseeable that [S.B.] would be exposed to and was at higher risk for the exact self reported harm which she suffered . . . .

*Id.* at 214. The report made clear the specific conduct called into question and provided a sufficient basis for the trial court to conclude that the claim had merit. *Id.* at 215.

In this case, however, the report indicates that Texarkana Nursing failed to provide "a safe and secure environment for its residents, allowing the documented assault of Ms. Vest by

---

[8]Shaw's report indicates he reviewed the following records in conjunction with issuing his report:

1) Nursing Home Records from Texarkana Nursing and Healthcare Center
2) Affidavit from the Texas Board of Nursing
3) Offense Report by Officer Steven G. Womack
4) Pictures of Mrs. Vest taken by her daughter
5) Arrest Report of Mary Elliott Bean.

one if its own employees." In other words, the assault itself is the breach of the standard of care, which requires the provision of a safe and secure environment for nursing home residents. This statement does not, however, advise Texarkana Nursing of what should have been done in order to prevent its employee from assaulting Vest.

The question boils down to one of how much detail is needed in order for an expert report to withstand Chapter 74 scrutiny when the harm alleged arises from assaultive conduct. Lyle points to *Christus Spohn Health System Corp. v. Sanchez*, 299 S.W.3d 868 (Tex. App.—Corpus Christi 2009, pet. denied), in support of her contention that the report is sufficient. *Sanchez* involved an action against a hospital and hospital employees in their individual capacities for assault and intentional infliction of emotional distress. Sanchez was an I.C.U. patient when a registered nurse and a certified nurse's assistant allegedly entered her room and made unwanted sexual advances toward her. Sanchez alleged that one of the men undressed her and exposed her body for the other to see. She further claimed that they turned her over using their hands instead of a turning pad and, while they were moving her from the bed to a chair in her room, they danced with her. Sanchez alleged that during these physical contacts, the nurse and nurse's assistant made sexual overtures and comments and that the improper conduct continued until she was discharged from the hospital a few days later. *Id*. at 872.

Sanchez sued the hospital for negligent hiring, supervision, training, and retention of its employees and vicarious liability for the conduct of its employees. Relevant to this case, Sanchez's expert report was attacked on the basis that it did not adequately set forth the standard of care and/or safety and breach because the report was alleged to be conclusive and speculative.

10

*Id.* at 877. Spohn further argued that the report failed to provide specific information about what it should have done differently. The report stated, in relevant part, that the "standard of care requires that the hospital and its nursing staff provide adequate supervision to their certified nursing assistants and licensed nursing personnel." The report further stated that the "standard of care requires that the hospital and its nursing staff protect their patients from sexual harassment and abuse." *Id.*

The court concluded that the report identified the care that was expected, but not rendered under the applicable standard of care, because it states the hospital "[f]ailed to provide adequate supervision to the [certified nurse's assistant] and the [registered nurse]," "[f]ailed to protect Ms. Sanchez from sexual harassment and sexual abuse," and "[f]ailed to provide safety to Ms. Sanchez in her immediate post operative [sic] when the [certified nurse's assistant] lifted Ms. Sanchez up and began dancing with her." *Id.* The court found that this report put the hospital on notice of the specific, complained-of conduct. *Id.*

In this case, unlike *Sanchez*, the report simply states that Texarkana Nursing failed to provide a safe and secure environment for Vest. In *Sanchez*, however, the report stated that the hospital was required to provide adequate supervision of its certified nursing assistants and licensed nursing personnel, to protect its patient from sexual harassment and abuse, and to keep the patient safe. Granted, this is not much more detail than we have in this case, but *Sanchez* may be close to the line of what is permissible.

For example, *Baylor All Saints Medical Center v. Martin*, 340 S.W.3d 529 (Tex. App.—

Fort Worth 2011, no pet.), involved an alleged sexual assault on a patient in her hospital room.[9]

The hospital objected to the sufficiency of the patient's expert report. The report in question

articulates the standard of care as follows:

> A hospital such as Baylor All Saints Medical [C]enter is expected to adhere to specific standards of care in regard to all of its patients. A bedrock principal [sic] in providing care to its patients is the understanding that all of a hospital's patients by nature of their disease or injury are potentially vulnerable and necessarily need to receive treatment in a safe and secure environment. The Joint Commission on Accreditation of Health Care Organizations (JCAHO) has established in its Hospital Standards that all healthcare organizations must have in place policies which safeguard patients from assault by hospital staff and by strangers that enter the hospital. The JCAHO requires that hospitals adequately implement these standards, and monitor this implementation. The JCAHO patient security and safety expectations would require at a minimum that hospitals should employ a sufficient number of security personal [sic] to insure that no unauthorized persons enter patients['] rooms and physically assault their patients. Additionally, the JCAHO standards would expect that all hospital staff should be trained to identify persons that are not authorized to enter patients['] rooms and should monitor and prevent unauthorized persons from having access to patients receiving treatment at the hospital.

*Id*. at 533–34. The court determined this to be an insufficient statement of the standard of care.

For example, the report stated that there must be policies in place to safeguard patients from

assault, including employing a sufficient number of security personnel. The court wrote that this

statement failed to indicate what specific policies and safeguards should have been in place.

Further, the "'policies in place to safeguard patients' are not identified." *Id.* at 534. The number

of security personnel needed and the training the staff should have received is not described. *Id.*

This report failed in light of the required standard, i.e., "what an ordinary prudent hospital would

---

[9]The *Martin* opinion does not indicate whether the assault was committed by a hospital employee, another patient, or some other third party.

12

do under the same or similar circumstances," and "even a fair summary must set out what care was expected." *Id*. (citing *Palacios*, 46 S.W.3d at 880).[10]

*Kingwood Pines Hospital, LLC v. Gomez*, 362 S.W.3d 740 (Tex. App.—Houston [14th Dist.] 2011, no pet.), further illustrates the need for detail when an expert offers opinions regarding patient safety. In that case, a patient of Kingwood Pines Hospital was sexually assaulted by another patient. Gomez offered an expert report indicating a failure "to ensure that there were appropriately trained and adequate staffing and millieu structure such that a young girl . . . would not be sexually molested." The report stated that the standard of care was breached when the physician failed to insure her patient's safety using "any of the number of measures available," by failing to "provide additional supervision" and not affording the patient "the most basic supervision." *Id*. at 750. The report further indicated that (the physician) was required "to insure her patients are being treated in a safe and secure environment by being aware of the environment, patient population, and safety measures taken by the hospital." *Id*. at 749. In concluding the report was conclusory, the court noted that it did not provide information about how the physician was to insure that the hospital was adequately staffed and that staff members were appropriately trained or what measures were available to insure the patient's

---

[10]The court also addressed Martin's claim that the report was all that could be done at the time in light of the fact that Section 74.351(s) only allows discovery of medical records and billing records, which do not contain the circumstances surrounding the assault and hence provide no discovery as to whether security standards were met. The court wrote that this was a misreading of the discovery allowed under Section 74.351(s). Because assaults in health care settings are covered by Section 74.351, said the court (*Martin*, 340 S.W.3d at 534 (citing *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 851 (Tex. 2005))), logically, discovery of the hospital's policies and procedures regarding the protection of patients from assault must be covered by Section 74.351(s). *Martin*, 340 S.W.3d at 534.

safety. Further, the report did not indicate what kind of supervision by the hospital was sufficient to provide a secure environment for the patient. *Id*. at 750.

In this case, the only direct negligence claim addressed in Shaw's report is that of failing to provide Vest with a safe and secure environment. Because the report fails to articulate what Texarkana Nursing should have done differently to prevent the assault, it is deficient with respect to articulation of the standard of care and its breach.

### (2) Causation

Texarkana Nursing further contends that Shaw's report is deficient in that it fails to set forth the causal relationship between Texarkana Nursing's alleged deviations from the standard of care and Vest's injuries. The report does, however, indicate that Texarkana Nursing breached its responsibility to Vest in allowing the documented assault of Vest by one of its own employees, resulting in injury to Vest. The resulting injuries are described. Lyle maintains that this is a sufficient statement of causation under *Timberlawn*. After all, assault is not a medical condition. Conversely, if the report is not sufficiently detailed in its statement of the standard of care and breach, and, thus, fails to advise Texarkana Nursing of what it should have done differently to provide a safe and secure environment for Vest, then it logically follows that causation should be described in terms of the specific shortcomings that created a situation in which assault could occur.

### B. Deficiencies Regarding Direct Liability Are Curable

Texarkana Nursing contends that because the report does not address the pleaded cause of action, it does not constitute a good-faith effort to comply with the statutory requirements and

14

should, therefore, be dismissed in reliance on *Windsor v. Maxwell*, 121 S.W.3d 42, 51 (Tex. App.—Fort Worth 2003, pet. denied) (to inform defendant of specific conduct plaintiff has called into question, report must support cause of action alleged by plaintiff in its pleadings).  Here, as previously discussed, the report does address the claim that Texarkana Nursing had a duty to assist Vest in attaining and maintaining "the highest practicable level of physical, mental, and psychosocial well being."  Implicit in this duty is the provision of a safe and secure environment. *See Harris Methodist Fort Worth*, 342 S.W.3d at 527.  The report, albeit in a conclusory manner, addresses this claim.

Because the report is deficient with respect to Lyle's direct liability claim regarding the failure to provide a safe and secure environment for Vest, the trial court should be permitted the opportunity to consider whether to grant a thirty-day extension to cure the deficiencies.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c) (West 2011);[11] *Leland v. Brandal*, 257 S.W.3d 204, 207 (Tex. 2008); *Longino v. Crosswhite*, 183 S.W.3d 913, 918 n.2 (Tex. App.—Texarkana 2006, no pet.); *see also Scoresby v. Santillan*, 346 S.W.3d 546, 549 (Tex. 2011) (trial court should err on side of granting additional time and must grant it if deficiencies are curable).[12]  Because at least three of Lyle's direct liability claims necessarily relate to the provision of a safe

[11]Section 74.351 of the Texas Civil Practice and Remedies Code states, "If an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the Court may grant one 30-day extension to the claimant in order to cure the deficiency."  TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c).

[12]*Scoresby* involved a letter report that failed to state the standard of care but implied that it was inconsistent with the physicians' conduct.  Even so, the report contained the opinion of an individual with expertise that the claim had merit and implicated the defendants' conduct.  This minimal standard is met here as well.  The report is written by an individual with expertise, implicates the conduct of Texarkana Nursing, and indicates that the claim has merit. *Scoresby*, 346 S.W.3d at 557.

environment, they are not completely unaddressed, and we decline to find that such claims should be dismissed.[13]  *See Querry v. Sanders*, No. 06-08-00099-CV, 2009 WL 1097904, at *7 (Tex. App.—Texarkana Apr. 24, 2009, no pet.) (mem. op.) (report which wholly failed to address alleged negligence in failing to properly identify and isolate main bile duct before initiating main procedure not curable deficiency).

### C.    Shaw's Report Fails to Address Vicarious Liability Claims

Lyle's petition alleges that Texarkana Nursing has "vicarious liability for the acts and omissions of all persons or entities under their control, either directly or indirectly, including employees, agents, consultants, and independent contractors, whether in-house or outside entities, individuals, agencies, or pools causing or contributing to the injuries of BETTY RUTH VEST."  "When a party's alleged health care liability is purely vicarious, a report that adequately implicates the actions of that party's agents or employees is sufficient."  *Gardner v. U.S. Imaging*, *Inc*., 274 S.W.3d 669, 671–72 (Tex. 2008) (per curiam).  Thus, if the report identifies conduct by Texarkana Nursing's employee, Texarkana Nursing is implicated.  As long as the report adequately addresses the standard of care applicable to the employee, how the employee breached the standard of care, and that the breach caused the plaintiff's injury, it is sufficient as against Texarkana Nursing to satisfy the expert report requirement for the vicarious liability claims.  *See RGV Healthcare Assocs.*, *Inc. v. Estevis*, 294 S.W.3d 264, 273 (Tex. App.—Corpus Christi 2009, pet. denied).

---

[13]Lyle alleges that Texarkana Nursing was negligent in terms of hiring, staffing levels, supervision of personnel, provision of financial resources, and in failing to comply with the Code of Federal Regulations.

Lyle pled that the staff of Texarkana Nursing did not provide Vest with timely and accurate care assessments and necessary supervision; failed to use reasonable care in treating residents with the degree of skill and learning ordinarily possessed and used by nursing home facilities in the same or similar locality; failed to assist residents (including Vest) in attaining and maintaining the highest practicable level of physical, mental, and psychosocial well-being; failed to meet the applicable standards of care; violated their duty of care to Vest through mistreatment, abuse and neglect; and violated Section 22.04 of the Texas Penal Code (injury to elderly individual). Shaw's report is silent with respect to each of these claims, with the exception of assaultive conduct and mistreatment. The report identifies conduct by Texarkana Nursing's employee—the alleged assault on Vest. The report fails, however, to identify the standard of care, breach of the standard of care, or causation.

The only statement regarding the standard of care in the entire report regarding the staff is: "The standard of care for a long term care facility *and its staff* requires that the facility in question provide that level of care and treatment that a reasonable, prudent, similar facility would provide under the same or similar circumstances." (Emphasis added.) The report says nothing regarding the breach of the standard of care by the staff or how that breach caused Vest's injuries. While the underlying nature of the vicarious liability claim rests in the intentional acts of Bean, which appear to be unrelated to the rendition of health care, Lyle's pleading alleges her claims fall within the purview of Chapter 74.[14] We must, therefore, analyze them as such. *See*

---

[14]Recently, the Texas Supreme Court decided *Loaisiga v. Cerda*, 379 S.W.3d 248 (Tex. 2012). *Loaisiga* was not decided until after the appellant's brief was filed here and well after the hearing in the trial court. In *Loaisiga*, two female patients sued a medical doctor, the professional association bearing his name, and a clinic alleging the doctor

17

assaulted them by groping their breasts while examining them for sinus and flu symptoms. *Id*. at 253. The patients served the doctor and professional association with reports from a physician who, based on the assumption that the allegations in the plaintiffs' pleadings were true, opined that the doctor's alleged actions did not fall within any appropriate standard of care. The defendants argued that the claims were health care liability claims and moved for dismissal on the basis that the reports were deficient. The trial court denied the motions. The court of appeals held that the claims were not health care liability claims and that expert reports were not required and affirmed the trial court's order without considering the report's adequacy. *Id*. at 254. The high court recognized a presumption:

> The breadth of the statute's text essentially creates a presumption that a claim is an HCLC if it is against a physician or health care provider and is based on facts implicating the defendant's conduct during the course of a patient's care, treatment, or confinement. *See* [*Marks v. St. Luke's Episcopal Hosp.*, 319 S.W.3d 658, 662 (Tex. 2010)]. But the presumption is necessarily rebuttable. In some instances the only possible relationship between the conduct underlying a claim and the rendition of medical services or healthcare will be the healthcare setting (i.e., the physical location of the conduct in a health care facility), the defendant's status as a doctor or health care provider, or both.

*Id*. at 256. Following a discussion of the statute's requirement that claimants in health care liability claims file expert reports, the high court wrote:

> [W]e fail to see how the Legislature could have intended the requirement of an expert report to apply under circumstances where the conduct of which a plaintiff complains is wholly and conclusively inconsistent with, and thus separable from, the rendition of "medical care, or health care, or safety or professional or administrative services directly related to health care" even though the conduct occurred in a health care context. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.001(a)(13); *see also* TEX. GOV'T CODE ANN. § 311.021 ("In enacting a statute, it is presumed that . . . a just and reasonable result is intended . . . .").

*Id*. at 257.

The court then listed three factors that must be reflected in the record in order for an assault claim against a medical or health care provider *not* to be considered a health care liability claim:

> [A] claim against a medical or health care provider for assault is not an HCLC if the record conclusively shows that (1) there is no complaint about any act of the provider related to medical or health care services other than the alleged offensive contact, (2) the alleged offensive contact was not pursuant to actual or implied consent by the plaintiff, and (3) the only possible relationship between the alleged offensive contact and the rendition of medical services or healthcare was the setting in which the act took place.

*Id*.

In determining whether a claim is subject to the Texas Medical Liability Act's (TMLA) expert report requirements, the trial court is not limited to the four corners of the expert report; instead, the trial court should consider the entire record, including pleadings, motions and responses, and relevant evidence properly admitted. *Id*. at 258. In *Loaisiga*, the court noted a lack of information to give context to the physician's actions during the examinations, such as medical records, reports, and other information regarding the plaintiffs' symptoms and complaints to the physician. This lack of information prevented the plaintiffs from conclusively showing that "the

*Giron v. Baylor Univ. Med. Ctr.*, No. 05-09-00825-CV, 2011 WL 149981, at \*2 (Tex. App.—Dallas Mar. 1, 2011, pet. denied) (mem. op.) (when Giron chose to proceed under Chapter 74 and plead her cause of action as health care liability claim, she bound herself to statutory requirements).

The lone statement regarding the standard of care applicable to the staff of Texarkana Nursing fails to specify what is required of a reasonable and prudent staff under the same or similar circumstances. This statement is not a fair summary of Shaw's opinions regarding the standard of care for the Texarkana Nursing staff. The mere recitation of a legal standard, in the absence of specific facts applicable to this case, is not a good-faith effort to articulate the standard of care. *See Lira v. Cerna*, No. 08-01-00250-CV, 2002 WL 1767569, at \*6 (Tex. App.—El Paso Aug. 1, 2002, no pet.) (not designated for publication) (The statement that "[t]he standard of care requires that a physician provide that level of care which a reasonable prudent physician would provide in the same or similar circumstances" does not demonstrate good-faith

---

only relationship between the alleged touching of their breasts and Dr. Loaisiga's rendition of medical services was the physical location of the examination . . . ." *Id.* at \*259. The court went on to say that

> because we are clarifying the standard for whether claims are subject to the TMLA's expert report requirements and the plaintiffs maintain that theirs are not, we conclude it is appropriate to remand the case to the trial court for further proceedings regarding that issue. *See Low v. Henry*, 221 S.W.3d 609, 621 (Tex. 2007) (remanding "to allow the parties to present evidence responsive to our guidelines").

*Id.* at 260.

In light of *Loaisiga*, this Court questioned whether to remand the case to the trial court for a determination of whether or not Lyle's claim is, in fact, a health care liability claim. However, in *Loaisiga*, the plaintiffs maintained that their claims were not health care liability claims. Here, Lyle has represented to this Court that her claims are health care liability claims, and, in oral argument, Lyle's counsel stated it was not her wish to remand the case to the trial court for a determination of whether her claims are subject to the TMLA's expert report requirements.

19

effort to provide fair summary of expert's opinions and does not identify standard of care.); *see also Hood v. Phillips*, 554 S.W.2d 160, 165 (Tex. 1977) (holding that legal standard for medical profession is "reasonable and prudent" physician "under the same or similar circumstances"). Moreover, the report is silent regarding the breach of the standard of care and causation. Because the standard of care applicable to the staff is not identified, and because breach and causation are not addressed, these deficiencies are not curable. Lyle's vicarious liability claims should, therefore, have been dismissed by the trial court.

## IV.    Conclusion

Because the report is deficient with respect to Lyle's direct liability claim regarding the failure to provide a safe and secure environment for Vest, we remand this claim to the trial court to consider whether to grant a thirty-day extension to cure these deficiencies.

Shaw's report is silent with respect to the standard of care, breach, and causation regarding her vicarious liability claims. Because these deficiencies are not curable, Lyle's vicarious liability claims are dismissed.


                                        Jack Carter
                                        Justice


Date Submitted:      November 20, 2012
Date Decided:        December 14, 2012


20