GRACY WOODS I NURSING HOME, Appellant

v.

Martha MAHAN, as the Representative of the Estate of Mary Rivera, Appellee

NO. 03–15–00596–CV

Court of Appeals of Texas, Austin.

Filed: May 4, 2017

Rehearing Overruled May 31, 2017

---

---

Emily J. Davenport, Reed, Claymon, Meeker & Hargett, P.C., Austin, TX, for Appellant.

John H. Modesett III, Modesett Williams PLLC, Austin, TX, for Appellee.

Before Chief Justice Rose, Justices Pemberton and Bourland

## OPINION

Bob Pemberton, Justice

This is an appeal taken by a health care provider, a nursing home, to challenge the district court's denial of its motion to dismiss a "health care liability claim" based on the claimant's asserted noncompliance with the Medical Liability Act's expert-report requirement. The pivotal issue in the appeal is whether the claimant, who alleges that her late mother was sexually assaulted in the nursing home due to the facility's negligence, was required to present an expert report that would establish the alleged assault in fact occurred, through an expert qualified to diagnose the occurrence of rape or sexual assault, or merely a causal linkage between the facility's asserted breach of the duty of care in regard to patient safety and the type of harm and injury the claimant alleges. Concluding the latter, and that the nursing home has not otherwise demonstrated any abuse of discretion in the district court's ruling, we will affirm.

## BACKGROUND

The claimant, Martha Mahan, is the daughter of the late Mary Rivera, who in her waning years had severe dementia and resided in a nursing home operated by the appellant, Gracy Woods I Nursing Home. Mahan alleges that during a visit to her mother at Gracy Woods one morning, Mahan "noticed signs of a struggle in her mother's room and found bloody tissue in the bathroom trashcan," leading to a "rape examination" at a local emergency room that, according to Mahan, confirmed that her mother had been sexually assaulted. Mahan attributes this alleged assault to Gracy Woods's negligence in failing to adequately protect her mother, especially vulnerable given her cognitive state, from being victimized in this way. Mahan further claims that she had actually warned Gracy Woods staff previously "that her mother was receiving inappropriate advances from other much younger residents." Gracy Woods denies these allegations, or even that the sexual assault ever occurred.

The parties do not dispute that Mahan's claim is a "health care liability claim" (HCLC) under the Medical Liability Act (MLA).[1] Thus, in an attempt to comply

---

1. *See* Tex. Civ. Prac. & Rem. Code § 74.001(a)(11) (J) (including "nursing home" in definition of " '[h]ealth care institution' "); *id.* § 74.001(a)(12)(A)(vii) (including "health care institution" in definition of " '[h]ealth care provider' "); *id.* § 74.001(a)(13) (" 'Health care liability claim' means a cause of action against a health care provider" for, inter alia, "other claimed departure[s] from accepted standards of medical care, or health care, or safety "); *Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 504–05 (Tex. 2015) (requiring "a substantive nexus between the safety standards allegedly violated and the provision of health care," i.e., "[t]he pivotal issue ... is whether the standards ... impli-

with the MLA's expert-report requirement,[2] Mahan served Gracy Woods with a report from Loren G. Lipson, M.D., as well as a copy of Dr. Lipson's curriculum vitae (CV). In his report, Dr. Lipson opined that Gracy Woods breached the applicable standard of care by not providing twenty-four-hour-a-day skilled nursing care and by not preventing access to Rivera's room by unsupervised males. Dr. Lipson further opined that Gracy Woods's breach resulted in the sexual assault of Rivera, and there was "no evidence" that Rivera's injuries were self-inflicted or inflicted by someone outside Gracy Woods.

Gracy Woods objected to Dr. Lipson's qualifications and to the sufficiency of his report. Subsequently, after the MLA's expert-report deadline had run, Gracy Woods moved to dismiss Mahan's suit with prejudice and for attorney's fees.[3] It argued that Dr. Lipson was not qualified to offer expert opinions regarding causation or liability, and his report lacked the factual bases required by the MLA. Following a hearing at which the parties presented argument, the district court denied the motion to dismiss. This interlocutory appeal followed.[4]

## ANALYSIS

■■■ We review a trial court's determination regarding the sufficiency of an expert report under an overarching abuse-of-discretion standard.[5] We "defer to the trial court's factual determinations if they are supported by evidence, but review its legal determinations de novo."[6] A trial court abuses its discretion if it acts "without reference to guiding rules or principles."[7]

■■■ The MLA defines an "[e]xpert report" as:

[A] written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the

cate the defendant's duties as a health care provider, including its duties to provide for patient safety"); *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 845, 847–55 (Tex. 2005) (concluding nursing home resident's claims, arising from nursing home's alleged failure to protect her from sexual assault by another resident, were HCLCs under former Tex. Rev. Civ. Stat. art. 4590i, § 1.03(a)(4) (citing Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.03(a)(4), 1977 Tex. Gen. Laws 2039, 2041, *repealed and recodified as amended by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 10.01, 10.09, 2003 Tex. Gen. Laws 847, 865, 884 (current version at Tex. Civ. Prac. & Rem. Code § 74.001(a)(13)))); *In re Seton Nw. Hosp.*, No. 03-15-00269-CV, 2015 WL 4196546 at *4, 2015 Tex. App. LEXIS 7119 at *9 (Tex. App.–Austin July 10, 2015, orig. proceeding) (mem. op.) ("[A] complaint such as that presented in *Diversicare*—that a health care provider has failed to implement adequate policies to protect patients—is a claim that is *directly* related to the provision of health care." (citing *Ross*, 462 S.W.3d at 501–02)).

**2.** *See* Tex. Civ. Prac. & Rem. Code § 74.351(a).

**3.** *See id.* § 74.351(b) (requiring dismissal of claim with prejudice and award of attorney's fees if "an expert report has not been served" by statutory deadline).

**4.** *See id.* § 51.014(a)(9) (permitting appeal from interlocutory order that "denies all or part of the relief sought by a motion under Section 74.351(b)").

**5.** *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015) (per curiam) (citing *Rosemond v. Al–Lahiq*, 331 S.W.3d 764, 766 (Tex. 2011) (per curiam); *American Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877 (Tex. 2001)).

**6.** *Id.* (citing *Stockton v. Offenbach*, 336 S.W.3d 610, 615 (Tex. 2011)).

**7.** *Id.* (citing *Samlowski v. Wooten*, 332 S.W.3d 404, 410 (Tex. 2011)).

causal relationship between that failure and the injury, harm, or damages claimed.[8]

"A court shall grant a motion challenging the adequacy of an expert report only if it appears ... that the report does not represent an objective good faith effort to comply with the definition of an expert report."[9] To constitute a " 'good-faith effort,' " the report must "provide[ ] information sufficient to (1) 'inform the defendant of the specific conduct the plaintiff has called into question,' and (2) 'provide a basis for the trial court to conclude that the claims have merit.' "[10] We are limited to "the four corners of the expert report, which need not 'marshal all the plaintiff's

proof' but must include the expert's opinion on each of the three main elements: standard of care, breach, and causation."[11] In sum, "[n]o particular words or formality are required, but bare conclusions will not suffice. The report must address all the elements, and omissions may not be supplied by inference."[12]

## Qualifications

 Gracy Woods contends that Mahan failed to meet the statutory requirements of an "expert report" because Dr. Lipson's report does not show he is an "expert" qualified to testify with respect to the opinions in his report regarding causation and the applicable standards of care.[13] An expert's qualifications must appear in his

8. Tex. Civ. Prac. & Rem. Code § 74.351(r)(6).

9. *Id.* § 74.351(*l*); *see Ross*, 462 S.W.3d at 502 ("The purpose of the TMLA's expert report requirement is not to have claims dismissed regardless of their merits, but rather it is to identify and deter frivolous claims while not unduly restricting a claimant's rights." (citing *Scoresby v. Santillan*, 346 S.W.3d 546, 554 (Tex. 2011))); *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 631 (Tex. 2013) ("[O]ne purpose of the report requirement is 'to expeditiously weed out claims that have no merit.' " (quoting *Loaisiga v. Cerda*, 379 S.W.3d 248, 263 (Tex. 2012))); *id.* ("[T]he purpose of evaluating expert reports is 'to deter frivolous claims, not to dispose of claims regardless of their merits.' " (quoting *Scoresby*, 346 S.W.3d at 554)); *id.* ("The expert report requirement is a threshold mechanism to dispose of claims lacking merit[.]").

10. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010) (quoting *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam) (citing *Palacios*, 46 S.W.3d at 879)); *Smith v. Wall*, No. 03-13-00482-CV, 2014 WL 2918007 at *2, 2014 Tex. App. LEXIS 6533 at *6 (Tex. App.–Austin June 18, 2014, no pet.) (mem. op.) (citing *Jelinek*, 328 S.W.3d at 538–40 & n.9; *Wright*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 878–79).

11. *Jelinek*, 328 S.W.3d at 539 (citing *Wright*, 79 S.W.3d at 52); *see Potts*, 392 S.W.3d at 630 ("A valid expert report has three ele-

ments: it must fairly summarize the applicable standard of care; it must explain how a physician or health care provider failed to meet that standard; and it must establish the causal relationship between the failure and the harm alleged." (citing Tex. Civ. Prac. & Rem. Code § 74.351(r)(6))); *Smith*, 2014 WL 2918007 at *2, 2014 Tex. App. LEXIS 6533, at *6–7 ("The only information relevant to determining whether an expert report complies with these requirements is that contained within 'the four corners' of the report itself." (citing *Palacios*, 46 S.W.3d at 878; *Hebert v. Hopkins*, 395 S.W.3d 884, 890 (Tex. App.–Austin 2013, no pet.))).

12. *Scoresby*, 346 S.W.3d at 556 (citing *Wright*, 79 S.W.3d at 53; *Palacios*, 46 S.W.3d at 879); *see Jelinek*, 328 S.W.3d at 539 (" '[T]he expert must explain the basis of his statements to link his conclusions to the facts.' " (quoting *Wright*, 79 S.W.3d at 52) (quoting *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999))); *Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex. App.–Austin 2007, no pet.) ("This requirement precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended." (citing, inter alia, *Wright*, 79 S.W.3d at 53)).

13. *See* Tex. Civ. Prac. & Rem. Code § 74.351(r)(5)(B), (C), (r)(6); *Harrington v. Schroeder*, No. 04-15-00136-CV, 2015 WL 9001573 at *3, 2015 Tex. App. LEXIS 12683

report and CV and "cannot be inferred."[14] Our analysis is limited to the four corners of the report and the CV.[15]

### Dr. Lipson's report and CV

Dr. Lipson's qualifications are set forth in his report and in his 44–page CV, which is attached to the report.[16] These documents indicate that Dr. Lipson is a physician trained in geriatric medicine[17] and licensed by the State of California. He is board certified in internal medicine[18] and in "quality assurance and utilization review."[19] He was previously board certified in geriatric medicine (though this certification has apparently lapsed), and he holds a "Certificate of Experience" in geriatric medicine.[20] Dr. Lipson has served for many years on the faculty of the USC School of Medicine, including as an Associate Professor of Medicine (Division of Geriatric Medicine, 1984–2006), as the Chief of the Division of Geriatric Medicine (1984–2005), and more recently, as a Professor Emeritus of Medicine (2006–present).[21] He was the Senior Staff Physician in charge of geriatric programs at the Los Angeles County/USC Medical Center (1985–2004), and the Chief of Geriatric Medicine at the

at *7 (Tex. App.–San Antonio Dec. 16, 2015, pet. denied) (mem. op.) ("An expert must establish that he is qualified to provide an acceptable report." (citing Tex. Civ. Prac. & Rem. Code § 74.351(r)(5)(B))); Ly v. Austin, No. 03-05-00516-CV, 2007 WL 2010757, 2007 Tex. App. LEXIS 5475 (Tex. App.–Austin July 13, 2007, no pet.) (mem. op.) ("To comply with the requirements of [former Civil Practice and Remedies Code article 4590i, section 13.01(d)], an 'expert report' first must be a 'written report by an expert.' " (quoting Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, 1995 Tex. Gen. Laws 985, 987 (defining "expert report," at former Tex. Rev. Civ. Stat. Ann. art. 4590i, § 13.01(r)(6)), repealed and recodified as amended by Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 10.01, 10.09, 2003 Tex. Gen. Laws 847, 876, 884 (current version at Tex. Civ. Prac. & Rem. Code § 74.351(r)(6) (emphasis added)))).

14. Harrington, 2015 WL 9001573, at *3, 2015 Tex. App. LEXIS 12683, at *7 (citing Olveda v. Sepulveda, 141 S.W.3d 679, 683 (Tex. App.–San Antonio 2004), pet. denied, 189 S.W.3d 740 (Tex. 2006)); see In re McAllen Med. Ctr., Inc., 275 S.W.3d 458, 463 (Tex. 2008) (orig. proceeding) (concluding expert's CV failed to establish her qualifications); Ly, 2007 WL 2010757, at *2, 2007 Tex. App. LEXIS 5475, at *7 (" '[T]he report itself must establish the expert's qualifications on the basis of training and experience.' " (quoting In re Samonte, 163 S.W.3d 229, 234 (Tex. App.–El Paso 2005, orig. proceeding))).

15. Harrington, 2015 WL 9001573, at *3, 2015 Tex. App. LEXIS 12683, at *7 (citing Tex. Civ. Prac. & Rem. Code § 74.351(a); In re McAllen Med. Ctr., 275 S.W.3d at 463); see also Ly, 2007 WL 2010757, at *2, 2007 Tex. App. LEXIS 5475, at *7 ("The expert's curriculum vitae is considered part of the report." (citing In re Windisch, 138 S.W.3d 507, 511 (Tex. App.–Amarillo 2004, orig. proceeding))).

16. Dr. Lipson's CV is dated August 1, 2009. To the extent the CV describes Dr. Lipson's experience as continuing to the "present," the term "present" means August 1, 2009.

17. Dr. Lipson is a 1969 graduate of the John Hopkins University School of Medicine, and he did his internship and residency at the John Hopkins Hospital. His fellowships include Harvard Medical School (geriatric medicine), Beth Israel Hospital (gerontology), Brigham–Women's Hospital (gerontology), Hebrew Rehabilitation Center (Clinical Fellow in geriatric medicine) and John Hopkins (Clinical Fellow in medicine).

18. From the American Board of Internal Medicine, 1974.

19. From the American Board of Quality Assurance and Utilization Review Physicians, 1995.

20. From the American Board of Internal Medicine, 1996.

21. His responsibilities at USC have included oversight of the geriatric-medicine fellowship program (1985–2004), and the development and improvement of the geriatric medical curriculum (1985–2004).

USC University Hospital (1991–2004). He also served as the Physician Advisor to USC University Hospital in "utilization management and quality assurance."[22] Moreover, he has received academic appointments from other universities and hospitals, including from the University of Alaska, where he has served since 2006 as an Affiliate Professor,[23] a Faculty Consultant in Geriatrics, and a Co–Director in Geriatric Education, and since 2005 as the Medical Director of the Alaska Geriatric Education Center.

Dr. Lipson is a consultant on long-term care, geriatric medicine and elder abuse to the United States Department of Justice (2006–present), the United States Department of Health and Human Services (2006–present), Office of the Inspector General, and to the states of California (2000–present)[24] and New Mexico (2003–present).[25] His CV lists nearly 200 lectures (selected from over 3,500 lectures given), including lectures related to geriatrics, long-term care, and elder abuse.[26] His CV also lists his "[r]esearch [i]nterests" as in-

22. In addition, he served in various directorships in the Los Angeles area related to geriatric medicine, including the Director of the USC Ambulatory Health Center sites at the Japanese Retirement Homes and Angelus Plaza (1985–1993); the Director of the Division of Geriatric Medicine's Program at the V.A. Outpatient Clinic in downtown Los Angeles (1986–2001); the Director of the USC Teaching Nursing Home Program at Hollenbeck Home and Atherton Baptist Home (1995–2005); and the Co–Director—Adult Protective Team—Geriatric Medicine Program—LAC/USC Medical Center (2000–2004).

23. Specifically, Dr. Lipson has served since 2006 as an Affiliate Professor at the University of Alaska College of Health and Social Welfare, and at the University of Alaska Biomedical WWAMI Program, College of Arts and Sciences. His "[a]reas of involvement" include the Alaska Geriatric Education Center, geriatric assessment, pre-med and medical education, and long term care.

24. Dr. Lipson's consulting work for the State of California includes consulting the California Office of the Attorney General, Bureau of Medical Fraud and Elder Abuse, related to "Operation Guidelines (nursing homes [–] unannounced inspections), 2000–Present." He also served as a member of the Task Force on Elder Abuse, City of Los Angeles (2001–2004).

25. In addition, Dr. Lipson served as a consultant to the State of Alaska on geriatric medicine and long term care (1991–2004), and as a consultant to the State of Alaska, Department of Law, on long term care, elder abuse and geriatric medicine (2000–2003). His

"[a]reas of involvement" include serving as a Director of the "Care of Elderly Conference."

26. See, e.g., Standard of Care, Symposium on Elder Abuse, Department of Justice, State of California, Bureau of Medi–CAL Fraud and Elder Abuse, San Mateo, California, May 2007; Sex After 60, The Chart in the Skilled Nursing Home, Promoting Best Practices in Aging Conference, University of Alaska, Anchorage—6/8/06–6/10/06; Assessment of the Chart in Skilled Nursing Facilities, Symposium on Elder Abuse, Department of Justice, Bureau of Medical Fraud and Elder Abuse, Long Beach, California 6/6–6/9/05; Elder Abuse, Coping With Chronic Disease, Cardiovascular Risk Factors in the Elderly, Senior Lives Conference, University of Alaska, Anchorage Alaska, 6/10/05; Assessment of Mental Competency and Discussion of an Elder Abuse Case, Symposium on Elder Abuse, Department of Justice—Bureau of Medi–Cal Fraud and Elder Abuse, Squaw Valley, California, 5/27–5/30/03; Special Issues in Long Term Care, Assessment and Evaluation of the Anchorage Pioneers' Home, Anchorage, Alaska, 12/10–12/14/02; Patient and Family Satisfaction in Long Term Care, Alaska Pioneers' Home, Anchorage, Alaska, A site visit and symposium, 12/11/01–12/15/01; Geropsychological Evaluation of Seniors, Symposium on Elder Abuse, Department of Justice–Bureau of Medical Fraud and Elder Abuse, Rancho Mirage, California, 9/7/01; Geropsychiatric Assessment of the Elderly, Bureau of Medi–Cal Fraud and Elder Abuse, Department of Justice, State of California, Ontario California, 2/22/01; Symposium on Long-Term Care for Providers, Milwaukee, Wisconsin, 2/97, Keynote Speaker—Drugs in the elderly; State of Alaska, Division of Senior Services, 2/96,

cluding "[s]tudies in elder abuse" and his "[r]esearch in [p]rogress" as including "[s]tudies on the prevention and early detection of elder abuse." [27]

### Dr. Lipson's qualifications relating to "causation"

Dr. Lipson's report opines that Rivera was sexually assaulted, and that there is "no evidence" that her injuries were self-inflicted or inflicted by someone outside Gracy Woods. Gracy Woods contends that Dr. Lipson is not qualified to offer these "[c]ausation [o]pinions, [p]articularly [t]hat a [s]exual [a]ssault [o]ccurred," [28] because he has no experience regarding the diagnosis or treatment of sexual assault, nor the diagnosis or treatment of the female genitalia. Mahan counters that no such expert testimony is required here (though Dr. Lipson endeavored to cover these issues in his report), citing *UHS of Timberlawn, Inc. v. S.B. ex rel. A.B.*[29]

The plaintiff in *Timberlawn* alleged that, while a patient in a psychiatric treatment facility (Timberlawn), she was raped by a fellow patient.[30] The plaintiff claimed that Timberlawn's negligence proximately caused her injuries.[31] Timberlawn argued that the report of the plaintiff's expert was deficient because "[he] did not opine, nor did he show he was qualified to opine, as to whether [the plaintiff] had been raped." [32] "[T]he premise of Timberlawn's arguments" was that "the report of a qualified expert opining that [the plaintiff] was actually raped" was necessary to satisfy the statutory requirement that an expert report "identify the alleged causal relationship" between Timeberlawn's alleged breach and the plaintiff's alleged injuries.[33] Our sister court of appeals rejected this premise.[34]

The court in *Timberlawn* observed that the alleged "injury" in some healthcare liability claims "flow[s] from the existence of a medical condition that itself resulted from" (or was exacerbated by) the defendant's negligence.[35] "In such cases, identifying the causal relationship" may require

Lectures and site visits to six State of Alaska nursing homes; Department of Administration, State of Alaska, 4/92, Invited Speaker, Assisted living in long term care.

**27.** Dr. Lipson's CV lists various grants that he has received in connection with medical research on issues related to geriatric medicine, for example, (i) a 2003 grant from the State of Alaska on "Training in Quality Assurance of the Frail and Demented Elderly: CQI of Pioneers' Homes," and (ii) two grants from the State of Alaska (spanning from 1998 to 2002) regarding "Training in Gerophannacy, Fall Prevention, and Quality Assurance in the frail and demented elderly."

**28.** Regarding the element of causation, the MLA defines an "[e]xpert" as "a physician who is otherwise qualified to render opinions on [the] causal relationship under the Texas Rules of Evidence[.]" Tex. Civ. Prac. & Rem. Code § 75.351(r)(5)(C); *see id.* § 74.403(a). Under Rule of Evidence 702, a witness "is qualified as an expert by knowledge, skill, experience, training, or education" that "will help the trier of fact to understand the evidence or to determine a fact in issue." Tex. R. Evid. 702; *see also Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996) ("What is required is that the offering party establish that the expert has 'knowledge, skill, experience, training, or education' regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject." (citations omitted)).

**29.** 281 S.W.3d 207 (Tex. App.–Dallas 2009, pet. denied).

**30.** *Id.* at 209.

**31.** *Id.*

**32.** *Id.* at 211.

**33.** *Id.* at 212 (citing Tex. Civ. Prac. & Rem. Code § 74.351(r)(6)).

**34.** *Id.* at 212–13.

**35.** *Id.* at 212.

expert testimony as to how the breach of the applicable standard of care gave rise to (or exacerbated) the medical condition.[36] In contrast, "[r]ape is not a medical condition," but rather, "[i]t is an assault."[37] It "may—or may not—be accompanied by medically ascertainable evidence of physical trauma, or even physical evidence that it occurred."[38] Accordingly, the court declined to hold that the MLA required an expert report "opining that [the plaintiff] was in fact raped" as a condition to identifying the requisite "causal relationship."[39] However, the court required the plaintiff's expert report to "link Timberlawn's alleged negligence with [the plaintiff's] alleged harm or injuries-her sexual assault by a male patient."[40] After reviewing the report in light of this standard, the court concluded that the report sufficiently addressed how Timberlawn's alleged breach caused the plaintiff's injuries.[41]

We find *Timberlawn*'s analysis persuasive—while the MLA required Mahan to present an expert report that would establish a causal link between a breach of the standard of care and the type of "harm" or "injury" that allegedly befell her mother,[42] it did not require Mahan (at least at this stage of the case) to present expert testimony establishing that the sexual assault did in fact occur. In other words, the statute required Dr. Lipson's report to provide "a fair summary" of his opinions regarding the requisite causal link,[43] and the report was deficient only if it "[did] not represent an objective good faith effort to comply with" this requirement,[44] i.e., if it did not inform Gracy Woods of the specific conduct called into question and provide a basis for the trial court to conclude that Mahan's claims had merit.[45] In the context of this case, in which the alleged "harm" or "injury" was a sexual assault (which is not itself a medical condition and for which medically ascertainable evidence may not even exist),[46] we conclude that Dr. Lipson's report need not establish the fact of the assault itself in order to constitute a "good-faith" effort to provide "a fair sum-

36. *Id.*

37. *Id.*

38. *Id.*

39. *Id.* at 212–13 (citing Tex. Civ. Prac. & Rem. Code § 74.351(r)(6)).

40. *Id.* at 213 (citing *Wright*, 79 S.W.3d at 52; *Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245, 249 (Tex. App.–San Antonio 2004, no pet.)).

41. *Id.* at 213–15; *see also Kim v. Hoyt*, 399 S.W.3d 714, 719 (Tex. App.–Dallas 2013, pet. denied) (noting that, in *Timberlawn*, "[w]e concluded the plaintiff's expert report was sufficient in that it linked the breaches of the standard of care, the defendant's housing the female plaintiff in a male unit, to the harm she suffered, her self-reported rape" (citing *Timberlawn*, 281 S.W.3d at 214)).

42. *See* Tex. Civ. Prac. & Rem. Code § 74.351(r)(6) ("'Expert report' means a written report by an expert that provides a fair summary of the expert's opinions ... regarding ... the causal relationship between that failure [to meet the applicable standards of care] and the injury, harm, or damages claimed.").

43. *See id.*

44. *See id.* § 74.351(*l*) (permitting grant of motion challenging expert report "only if it appears to the court, ... that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)").

45. *See, e.g., Jelinek*, 328 S.W.3d at 539 ("We have defined a 'good-faith effort' as one that provides information sufficient to (1) 'inform the defendant of the specific conduct the plaintiff has called into question,' and (2) 'provide a basis for the trial court to conclude that the claims have merit.'" (quoting *Wright*, 79 S.W.3d at 52 (citing *Palacios*, 46 S.W.3d at 879))).

46. *See Timberlawn*, 281 S.W.3d at 212.

mary" of Dr. Lipson's opinions regarding the causal link between Gracy Woods's alleged breach and Rivera's alleged injury.

Gracy Woods attempts to distinguish *Timberlawn* by citing to subsequent decisions from our sister courts that it portrays as having "acknowledg[ed] the limited nature" of the *Timberlawn* holding. These authorities do not convince us that *Timberlawn*'s analysis is inapplicable here.[47] Gracy Woods further suggests that *Timberlawn* may have turned on the plaintiff's being available to testify at trial that she was sexually assaulted,[48] whereas here Rivera is now deceased, and thus will not testify. The fact that Rivera is unavailable as a witness makes no difference here.[49]

We conclude that the MLA did not require Dr. Lipson's report to opine that Rivera was in fact sexually assaulted as a component of the "causal relationship" between Gracy Woods's purported breach and Rivera's alleged injury. In turn, we cannot conclude that the district court abused its discretion in declining to dismiss Mahan's case based on Dr. Lipson's purported lack of expert qualifications as to this issue.[50]

### Dr. Lipson's qualifications relating to standards of care

■ Dr. Lipson's report describes the applicable standards of care as follows:

1. The standard of care requires the nursing home provide twenty-four hour a day skilled nursing care. The practical result of this requirement is that the staff must be moving through the halls and the rooms of the residents all night long. There should never be a time when a staff member is not in the next room or moving through the halls next to a resident's room.

47. *See Hernandez v. Christus Spohn Health Sys. Corp.*, No. 04-14-00091-CV, 2015 WL 704721, 2015, Tex. App. LEXIS 1538 (Tex. App.–San Antonio Feb. 18, 2015, no pet.) (rejecting plaintiff's contention that "an expert report on causation is not required in instances of rape or sexual assault"; noting that, although *Timberlawn* "held that the expert was not required to opine in his report on whether [the plaintiff] was in fact sexually assaulted, the [court] further addressed whether the expert report otherwise adequately addressed causation, noting the expert report was required to causally link the facility's alleged negligence with the alleged harm or injuries suffered by [the plaintiff]." (citing *Timberlawn*, 281 S.W.3d at 212–15)); *Kim*, 399 S.W.3d at 719 ("We concluded the plaintiff *in that case* [*Timberlawn*] was not required to submit an expert report that she was raped. We explained that the plaintiff's report was not required to establish the rape because (1) she was not complaining her injury gave rise to a medical injury or condition, (2) no expert testimony would be required to prove a rape occurred, and (3) no medical evidence might be available to support her claim." (emphasis added) (citing *Timberlawn*, 281 S.W.3d at 212–13)).

48. *See Timberlawn*, 281 S.W.3d at 212 ("[T]he testimony of a sexual assault victim alone is sufficient evidence of penetration to support a criminal conviction, even if the victim is a child." (citing *Karnes v. State*, 873 S.W.2d 92, 96 (Tex. App.–Dallas 1994, no pet.)); *see id.* at 214 (noting statements in expert's report that victim had "self reported rape").

49. *Cf. Villalon v. State*, 791 S.W.2d 130, 133 (Tex. Crim. App. 1990) (noting that, in criminal cases, "'penetration may be proved by circumstantial evidence,'" and "there 'is no requirement that the [victim] be able to testify as to penetration'" (quoting *Nilsson v. State*, 477 S.W.2d 592, 595–96 (Tex. Crim. App. 1972))); *Timberlawn*, 281 S.W.3d at 212 ("Medical evidence of an alleged sexual assault is not required even in criminal prosecutions; the rule in Texas is that 'penetration may be proven by circumstantial evidence.'" (quoting *Villalon*, 791 S.W.2d at 133)).

50. We separately address whether Dr. Lipson's report articulates an adequate factual basis to support his opinion that Gracy Woods's alleged breach of the applicable standard of care caused Ms. Rivera's injury. *See infra* at 26–30.

2. The standard of care requires that following the report of an assault at a nursing facility that the facility control unsupervised access to the rooms of residents at risk. The standard of care requires the facility take note of the families' concerns of inappropriate behavior and eliminate access to the patient by unsupervised males. Residents at risk include women with significant dementia such as Ms. Rivera. In light of the [family's] expressed concern of inappropriate advances to Ms. Rivera, the standard requires heightened scrutiny to include regular walks through the entire hall at intervals not to exceed ten minutes to prevent access to her room by males. The standard of care requires the nursing staff document the fact that it is performing the regular checks in the patients' charts. In addition, the standard of care requires Ms. Rivera be moved to a room in close proximity to the nursing station following complaints of inappropriate contact with Ms. Rivera.

■■■■■ Gracy Woods contends that Dr. Lipson does not demonstrate his qualifications to opine concerning these standards of care. While "expert qualifications should not be too narrowly drawn,"[51] a licensed doctor is not "automatically qualified to testify as an expert on every medical question."[52] "What is required is that the offering party establish that the expert has knowledge, skill, experience, training, or education regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject."[53] In the context of this appeal, we must consider whether the trial court abused its discretion in determining that Dr. Lipson's report and CV, within their four corners, adequately articulate his qualifications to opine on the standards of care at issue here.[54]

"[W]ith respect to ... opinion testimony regarding whether a health care provider departed from accepted standards of health care," the MLA defines an "[e]xpert" as one who is "qualified to testify under the requirements of [Civil Practice and Remedies Code] Section 74.402."[55] Section 74.402, in turn, provides that "a person may qualify as an expert witness on ... depart[ure] from accepted standards of care only if the person":

(1) is practicing health care in a field of practice that involves the same type

51. *Larson v. Downing*, 197 S.W.3d 303, 305 (Tex. 2006) (per curiam); *see also id.* at 304–05 (noting " '[t]he qualification of a witness as an expert is within the trial court's discretion' " (quoting *Broders*, 924 S.W.2d at 151), and "[c]lose calls must go to the trial court").

52. *Broders*, 924 S.W.2d at 152 ("[G]iven the increasingly specialized and technical nature of medicine, there is no validity ... to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on every medical question. Such a rule would ignore the modern realities of medical specialization.").

53. *Id.* at 153–54 (citations omitted) (internal quotation marks omitted). In other words,

"the proponent of the testimony has the burden to show that the expert 'possess[es] special knowledge as to the very matter on which he proposes to give an opinion.' " *Id.* at 152–53 (citation omitted).

54. *See In re McAllen Med. Ctr.*, 275 S.W.3d at 463; *Harrington*, 2015 WL 9001573, at *3, 2015 Tex. App. LEXIS 12683, at *7; *Ly*, 2007 WL 2010757, at *1–2, 2007 Tex. App. LEXIS 5475, at *5–7; *see also Scoresby*, 346 S.W.3d at 555–56; *Jelinek*, 328 S.W.3d at 539; *Wright*, 79 S.W.3d at 52–53; *Palacios*, 46 S.W.3d at 878–79.

55. Tex. Civ. Prac. & Rem. Code § 74.351(r)(5)(B).

of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;[56]

(2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.[57]

"In determining whether a witness is qualified on the basis of training or experience,

the court shall consider whether ... the witness:"

(1) is certified by a licensing agency of one or more states ... or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and

(2) is actively practicing health care[58] in rendering health care services relevant to the claim."[59]

This case, at its core, concerns the standards of care applicable to nursing homes in order to protect patients from harming each other.[60] Thus, Dr. Lipson's report and CV must articulate a factual basis[61] that sufficiently demonstrates (1) his "knowledge of [the] accepted standards of care"[62]

**56.** By its own terms, Section 74.402(b)(1) does not apply here since Gracy Woods, the "defendant health care provider," is not "an individual." *See Renaissance Healthcare Sys., Inc. v. Swan*, 343 S.W.3d 571, 588 (Tex. App.–Beaumont 2011, no pet.); *Doctors Hosp. v. Hernandez*, No. 01-10-00270-CV, 2010 WL 4121678, 2010 Tex. App. LEXIS 8453 (Tex. App.–Houston [1st Dist.] Oct. 21, 2010, no pet.) (mem. op.); *Northeast Med. Ctr., L.P. v. Crooks*, No. 06-05-00149-CV, 2006 WL 1358361, 2006 Tex. App. LEXIS 4333 (Tex. App.–Texarkana May 19, 2006, no pet.) (mem. op.). However, we note that Mahan's claim relates to the field of Geriatrics, and Dr. Lipson states in his report that he "continue[s] to treat patients in the long term care setting and ha[s] done so for more than thirty years."

**57.** Tex. Civ. Prac. & Rem. Code § 74.402(b)(1)–(3).

**58.** "[P]racticing health care" includes:
(1) training health care providers in the same field as the defendant health care provider at an accredited educational institution; or
(2) serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider.
*Id.* § 74.402(a)(1), (a)(2).

**59.** *Id.* § 74.402(c)(1), (2); *see Christian Care Ctrs., Inc. v. Golenko*, 328 S.W.3d 637, 645 (Tex. App.–Dallas 2010, pet. denied) ("[T]he factors in section 74.402(c) are not mandatory elements that must be proved before a witness is qualified as an expert." (citing *Heritage Gardens Healthcare Ctr. v. Pearson*, No. 05-07-00772-CV, 2008 WL 3984053, 2008 Tex. App. LEXIS 7283 (Tex. App.–Dallas Aug. 29, 2008, no pet.) (mem. op.))).

**60.** *See Diversicare*, 185 S.W.3d at 850 (noting obligation of nursing home to "protect [plaintiff] and the patient population from harming themselves and each other").

**61.** *See In re McAllen Med. Ctr.*, 275 S.W.3d at 463 (concluding report and CV failed to establish medical doctor's qualifications to opine on standard of care regarding hospital credentialing); *Ly*, 2007 WL 2010757, at *5, 2007 Tex. App. LEXIS 5475, at *16 ("An expert cannot rely on generalized, conclusory statements to establish her qualifications; she must provide specific details of her training and experience." (citing *Forrest v. Danielson*, 77 S.W.3d 842, 848 (Tex. App.–Tyler 2002, no pet.); *Tomasi v. Liao*, 63 S.W.3d 62, 66 (Tex. App.–San Antonio 2001, no pet.))).

**62.** Tex. Civ. Prac. & Rem. Code § 74.402(b)(2).

applicable to nursing homes, and (2) his qualifications "on the basis of training or experience to offer an expert opinion regarding [these] accepted standards," [63] e.g., his relevant licensing certifications, his "other substantial training or experience," and his "actively practicing health care in rendering health care services relevant to the claim." [64]

Dr. Lipson describes his familiarity with the standards of care as follows:

I have extensive personal experience in primary medical care as well as subspecialty consultation and long-term care. I personally have provided care for patients in addition to my academic teaching, research and administrative responsibilities. My background is more fully described in my curriculum vitae attached hereto . . . .

I am familiar with the problem of sexual assault in the nursing home setting. I am familiar with the standard of care for preventing such assaults.

I continue to treat patients in the long[-]term care setting and have done so for more than thirty years. I am familiar with the standard of care for the treatment of patients like Mary Rivera and familiar with the required training of employees providing care to residents like Mary Rivera.

In *Harrington v. Schroeder*, which involved a nursing home resident (Sylvia Ramos) who died from an assault by a fellow nursing home resident, the plaintiffs proffered an expert report by Dr. Lipson, which opined that the defendant, a physician, "was negligent in failing to":

(1) provide appropriate input as to Ms. Ramos's care plan; (2) perform timely and adequate assessments of Ms. Ramos; (3) document Ms. Ramos's medical care accurately; and (4) coordinate discharge of Ms. Ramos to another facility that could meet her needs.[65]

The defendant moved to dismiss, arguing that Dr. Lipson's report failed to establish his qualifications.[66] The defendant argued that Dr. Lipson was not qualified to testify as to the standard of care because he had not shown that he "was board certified and was actively practicing medicine or rendering medical care relevant to the claim . . . at the time the claim arose or at the time the report was authored." [67] Our sister court rejected this contention and observed:

Even though Dr. Lipson's board certifications may have lapsed, his training and experience make him sufficiently qualified in this case. According to the expert report, Dr. Lipson has extensive experience in the areas of geriatric medicine and long term care; he is also the author of several articles relating to those subjects. His resume reflects postgraduate training in the area of geriatrics and care of the elderly. Dr. Lipson's experience in geriatric medicine, as set forth in his 47–page curriculum vitae, is significant and he continues to be on staff at the University of Alaska, Anchorage and at the School of Community and Global Health, Claremont Graduate University. In addition, he is Professor Emeritus of Medicine at the University of Southern California. He also currently serves as a consultant to various governing bodies in the areas of geriatric care

63. *Id.* at § 74.402(b)(3).

64. *Id.* at § 74.402(c)(1), (c)(2).

65. *Harrington*, 2015 WL 9001573, at *1, 2015 Tex. App. LEXIS 12683, at *1–2.

66. *Id.,* 2015 WL 9001573, at *2–3, 2015 Tex. App. LEXIS 12683, at *6–7.

67. *Id.,* 2015 WL 9001573, at *3, *4, 2015 Tex. App. LEXIS 12683, at *7, *10–11.

and elder abuse. Accordingly, the fact that Dr. Lipson's board certifications have lapsed does not alone render him unqualified as an expert in this case.[68] The court held that "the trial court did not abuse its discretion in finding Dr. Lipson sufficiently qualified, as set forth in his report and curriculum vitae, to opine on the accepted standards of medical care applicable to [the defendant]." [69]

Gracy Woods nevertheless contends that Dr. Lipson's report fails to articulate a sufficient factual basis to demonstrate how or why he knows what the standards of care required of Gracy Woods in this case.[70] It contends that Dr. Lipson's experience as a physician treating geriatric patients in nursing homes, or serving on various committees, does not automatically establish his expertise to opine on the standards of care regarding nursing home policies and protocols for the prevention of sexual assaults.[71] For example, Gracy

Woods contends that Dr. Lipson's "report does not establish that he has ever participated in determining nursing home staffing levels or supervising nursing home staff, or that he has any expertise to opine that the standard of care requires nursing staff to walk the halls at intervals not to exceed ten minutes." It further contends that his report does not "offer any explanation ... as to how he would know the documentary requirements for nursing home staff, generally, or in relation to performing 'regular checks' on residents."

As previously discussed, Dr. Lipson is licensed to practice medicine in California, is board-certified in quality assurance and utilization review, and was previously board-certified in (and currently holds a "Certificate of Experience" in) geriatric medicine. He has treated patients "in the long[-] term care setting" for more than thirty-years, and he continues to do so. His

---

68. *Id.*, 2015 WL 9001573, at *4, 2015 Tex. App. LEXIS 12683, at *11–12. The court also rejected the defendant's contention that Dr. Lipson's report did not reflect that he was actively practicing medicine. *Id.*, 2015 WL 9001573, at *4–5, 2015 Tex. App. LEXIS 12683, at *12–13.

69. *Id.*, 2015 WL 9001573, at *4–5, 2015 Tex. App. LEXIS 12683, at *13 (citations omitted).

70. *See, e.g., Nexion Health at Garland, Inc. v. Treybig*, No. 05-14-00498-CV, 2014 WL 7499373, 2014 Tex. App. LEXIS 13968 (Tex. App.–Dallas Dec. 31, 2014, no pet.) (mem. op.) (in case involving standard of care applicable to nursing home that contracts with another provider to provide a resident with physical therapy, report and CV of board-certified geriatrician did not identify any experience supervising physical therapists, nor did report and CV demonstrate how geriatrician gained requisite experience to offer opinion on standard of care); *Tenet Hosps. Ltd. v. Love*, 347 S.W.3d 743, 747–48, 750–52 (Tex. App.–El Paso 2011, no pet.) (in case involving standard of care applicable to hospital for "staffing certain physician specialists and

transferring patients," reports and curricula vitae of cardiologist and pulmonologist "[did] not demonstrate whether the doctors' experiences have involved setting policies and procedures for hospitals, requiring hospitals to staff certain specialists under certain circumstances, or running a hospital"); *Christus Health Se. Tex. v. Broussard*, 267 S.W.3d 531, 534–36 (Tex. App.–Beaumont 2008, no pet.) (in case arising from hospital's " 'administrative decision'." to prematurely discharge patient, board-certified neurologist "[did] not explain how his experience with treating patients with fluctuating mental status gives him expertise regarding a hospital's 'administrative decision' about the circumstances under which a hospital can disregard a doctor's discharge order").

71. *See, e.g., Nacogdoches Cty. Hosp. Dist. v. Felmet*, No. 12-12-00393-CV, 2013 WL 6207838, 2013 Tex. App. LEXIS 14478 (Tex. App.–Tyler Nov. 26, 2013, no pet.) (mem. op.) ("Merely working at a hospital and serving on hospital committees does not automatically qualify an expert to testify on matters of operating a hospital." (citing *Love*, 347 S.W.3d at 750–51; *Broussard*, 267 S.W.3d at 536)).

report and CV describe his training and experience related to long-term care, geriatric medicine, and elder abuse, for example, his decades of service as a professor in geriatrics at the USC School of Medicine; his prior directorship of two USC Teaching–Nursing Home Programs; his consultantships to the federal government (the Departments of Justice and Health and Human Services) and to three state governments (California, New Mexico, and Alaska) regarding these topics, including consulting the California Attorney General on "Operation Guidelines (nursing homes [–] unannounced inspections)"; [72] his many lectures to governmental entities and nursing homes on issues related to these topics, including a lecture on the "Standard of Care" at a 2007 symposium on elder abuse; [73] his prior service as the Senior Staff Physician in charge of geriatric programs at the Los Angeles County/USC Medical Center, and as the Chief of Geriatric Medicine at the USC University Hospital; and his current service as a Professor Emeritus of Medicine at USC and as an Affiliate Professor at the University of Alaska. Based on this experience, Dr. Lipson states that he is "familiar with the problem of sexual assault in the nursing home setting" and "with the standard of care for preventing such assaults."

We conclude that Dr. Lipson's report and CV sufficiently articulate his qualifications to opine on the "accepted standards of health care" at issue here.[74] Accordingly, the trial did not abuse its discretion in finding Dr. Lipson qualified, as described in his report and CV, to opine on these standards of care.

### Sufficiency of the report

Gracy Woods also contends that Dr. Lipson's report lacks the requisite factual bases to support his opinions as to the elements of breach and causation.[75]

### *Breach of standards of care*

In addition to describing the applicable standards of care, Dr. Lipson describes how Gracy Woods breached these standards:

1. The facility breached the standard of care by not providing twenty-four hour skilled nursing care. The nursing staff was not present in the halls or her room to prevent the sexual assault of Ms. Rivera.

2. The facility breached the standard of care by not preventing access to her room by unsupervised males. The records do not indicate any checks on Ms. Rivera the night she was assaulted. The facility breached the standard of care by not moving Ms. Rivera to a room close to the nursing station where no unsupervised males could enter her room.

---

72. *See supra* at 8.

73. *See supra* at 8–9.

74. *See* Tex. Civ. Prac. & Rem. Code § 74.351(r)(5)(b), (r)(6); *id.* § 74.402(b)(2), (b)(3); *cf. Christian Care Ctrs. Inc.*, 328 S.W.3d at 642–44 (report reciting doctor's experience in geriatrics and internal medicine demonstrated qualifications to opine on standard of care regarding whether nursing home "should have recognized" that patient's Alzheimer's "condition was such that [nursing home] could not provide the care [patient] needed or could not protect its other residents

from [patient]"); *IHS Acquisition No. 140, Inc. v. Travis*, No. 13-07-481-CV, 2008 WL 1822780, 2008 Tex. App. LEXIS 2950 (Tex. App.–Corpus Christi Apr. 24, 2008, pet. denied) (mem. op.) (report reciting doctor's experience in geriatrics and elderly care issues demonstrated qualifications to opine on standard of care applicable to nursing homes regarding monitoring of patients for signs and symptoms of infection).

75. *Scoresby*, 346 S.W.3d at 555–56; *Jelinek*, 328 S.W.3d at 539; *Wright*, 79 S.W.3d at 52–53; *Palacios*, 46 S.W.3d at 878–79.

■ Gracy Woods contends that Dr. Lipson's report "offers only conclusory opinions without the requisite factual basis and explanation." In cases against health care providers arising from the alleged failure to prevent an assault, our sister courts have held expert reports deficient if they merely state that the provider "failed to provide a safe and secure environment" without any indication of what the facility "should have done differently to prevent the assault." [76] On the other hand, this Court has held that an expert report is sufficient if it specifies what the defendant "should have done" and what it "should have done differently." [77]

Gracy Woods contends that Dr. Lipson impermissibly seeks to infer a breach "based solely on the alleged injury," and his report lacks factual particulars such as "the location of Ms. Rivera's room or its proximity to the nursing station," or "where Ms. Rivera allegedly should have been moved in relation to the nursing station." Dr. Lipson's report details a "history of problems" at Gracy Woods, as well as prior inappropriate advances by another male resident towards Rivera, that made it "foreseeable assaults like this would occur without the proper precautions." [78] Given "the [family's] expressed concern of inappropriate advances to Ms. Rivera," Dr.

---

76. *Texarkana Nursing & Healthcare Ctr., LLC v. Lyle,* 388 S.W.3d 314, 318–22 (Tex. App.–Texarkana 2012, no pet.) (report stated that nursing home "did not provide a safe and secure environment for its residents" but "fail[ed] to articulate" what nursing home "should have done differently to prevent the assault"); *see also Kingwood Pines Hosp., LLC v. Gomez,* 362 S.W.3d 740, 750 (Tex. App.–Houston [14th Dist.] 2011, no pet.) (report stated that licensed professional counselor "fail[ed] to ensure that there were appropriately trained and adequate staffing and milieu structure such that a young girl … would not be sexually molested," but did not provide information as to how counselor "was to insure that hospital staff were appropriately trained and adequately staffed or what 'measures' were available … to insure her patient's safety"); *Baylor All Saints Med. Ctr. v. Martin,* 340 S.W.3d 529, 534 (Tex. App.–Fort Worth 2011, no pet.) (report opined that "there must be policies in place to safeguard patients from assault, including employing 'a sufficient number of security [personnel] … and training staff to identify persons not authorized to enter patients['] rooms …,'" but did not identify the "'policies in place to safeguard patients,'" nor "the number of security personnel required nor the training the staff should have received regarding identifying unauthorized persons" (citing *Wright,* 79 S.W.3d at 52)).

77. *Texas San Marcos Treatment Ctr., L.P. v. Payton,* No. 03-14-00726-CV, 2015 WL 7422989, at *4, 2015 Tex. App. LEXIS 11818 at *9 (Tex. App.–Austin Nov. 18, 2015, no

pet.) (mem. op.) ("We cannot conclude that the trial court abused its discretion by concluding that the expert's report here sufficiently informed the [defendant] of what it should have done and what it should have done differently." (citing *Palacios,* 46 S.W.3d at 880)); *see also Christus Spohn Health Sys. Corp. v. Sanchez,* 299 S.W.3d 868, 877 (Tex. App.–Corpus Christi 2009, pet. denied) (report identified care that was expected but not rendered by stating that hospital "'[f]ailed to provide adequate supervision'" to CNA and RN, "'[f]ailed to protect [patient] from sexual harassment and sexual abuse,' and '[f]ailed to provide safety to [patient] in her immediate post operative [sic] when the CNA lifted [patient] up and began dancing with her'").

78. Dr. Lipson notes that Gracy Woods "had a complaint of a sexual assault of a resident several months before the assault of Ms. Rivera" and was cited by the state for "[f]ailing to implement written policies that protect against this activity[,]" and for "[f]ailing to report the incident to law enforcement." He adds that Mahan had previously reported to management that "another male resident would inappropriately touch or speak to Ms. Rivera," and that "[t]he nurses caring for Ms. Rivera were aware of this behavior." He also states that Gracy Woods "has a history of reported abuse and sexual abuse and was cited by the state for several indications of neglect leading up to the assault of Ms. Rivera."

Lipson opines that the standard of care required "heightened scrutiny," including regular and frequent monitoring of the halls by staff throughout the night, the documentation of such monitoring in the patients' charts, and moving Rivera "to a room in close proximity to the nursing station." Dr. Lipson states that Gracy Woods breached this standard by not providing the required monitoring, documentation, and relocation of Rivera. Although Dr. Lipson's report does not specify the proximity of Rivera's room to the nursing station, or to which room she should have been moved, we conclude. that the trial court did not abuse its discretion in determining that the report "represent[ed] an objective good faith effort to comply with the definition of an expert report," i.e., the report "provide[d] a fair summary" of Dr. Lipson's "opinions . . . regarding applicable standards of care[.]" [70]

Gracy Woods also attempts to fault Dr. Lipson for not identifying who allegedly assaulted Rivera, and for not specifying when and where the purported assault occurred. Dr. Lipson's report describes circumstances that point to the evening of Friday, November 8, 2013, or the next morning of Saturday, November 9,[80] and to Rivera's room at Gracy Woods, as the

pertinent time and location.[81] We cannot say that the trial court abused its discretion in declining to require more detail in Dr. Lipson's report as to this issue, especially given that Rivera suffered from dementia, and Mahan did not discover until after the fact the circumstances that led her to believe that Rivera had been assaulted.

### Causation

 Dr. Lipson's report describes the harm to Rivera as follows:

The harm caused Ms. Rivera is significant. She was sexually assaulted. The injuries to her vagina are well documented in the SANE nurse [Sexual Assault Nurse Examiner] report and above. The daughter reports she was tearful and afraid. This is a common response in sexual assault victims. The daughter reports this behavior of fear continued even after Ms. Rivera was removed from the facility. The fact she suffered from dementia does not lessen the harmful mental effects of sexual assault. Even an animal can remember when it has been abused. In many ways Ms. Rivera was like a small child—confused and afraid as a result of this sexu-

---

**79.** Tex. Civ. Prac. & Rem. Code § 74.351(*l* ), (r)(6); *see also* Payton, 2015 WL 7422989, at *4, 2015 Tex.App. LEXIS 11818, at *10 ("[W]e cannot say that the trial court abused its discretion by concluding that [the report] constitute[d] a good-faith effort to inform the [defendant] of the conduct the plaintiff questions and to provide a basis for the trial court to conclude that the claims have merit." (citation omitted)).

**80.** Mahan's petition alleges that Rivera was assaulted on November 10, 2012, but Dr. Lipson's report references November 9, 2013 as the date that Mahan discovered circumstances that led her to believe her mother had been assaulted.

**81.** Dr. Lipson discusses a statement from Mahan (also attached to the report) that de-

scribes "alcohol parties that the nursing home had on Friday afternoons," at which "another male resident would inappropriately touch or speak to Ms. Rivera." Dr. Lipson observes that "[t]hese types of assaults, according to most reports in the literature, occur at night" and that "seniors such as Ms. Rivera who suffer from dementia" are "[a]t high risk." He adds that Ms. Mahan visited her mother early on November 9, a Saturday morning, and found her "more confused than usual and crying," with "broken Christmas ornaments on the floor." Ms. Mahan took her mother to the bathroom, and "she appeared to be in pain . . . [and] urinated standing up, which was unusual." Ms. Mahan also found "a pile of bloody rags in the trash."

al assault. The history of problems together with the decision to ignore the families' complaints and eliminate unsupervised males from Ms. Rivera's room indicates a conscious disregard for the well-being of Ms. Rivera by the facility's management.

 Gracy Woods contends that Dr. Lipson "does not explain, to any reasonable degree, how an alleged breach ... caused the injuries" to Rivera. "An expert must explain, based on facts set out in the report, how and why the breach caused the injury." [82] A report is deficient if it does not explain "how and why the [h]ospital's administrative failures resulted in the sexual assault" or "were a substantial factor in bringing about the alleged sexual assault." [83] However, a report meets the standard if its "assertions are tied to the facts and standards of care ... and show the connection alleged between the [defendant's] act or omission and the patient's assault on [the plaintiff] that caused the injuries she claims." [84] While a report must

describe more than a mere " 'possibility of causation,' " [85] it "is not required to prove the defendant's liability, but rather to provide notice of what conduct forms the basis for the plaintiff's complaints." [86]

For example, the court in *Timberlawn*, after declining to require an expert report opining that the plaintiff had in fact been assaulted, proceeded to consider the adequacy of the expert's report regarding the causal link between Timberlawn's actions and the plaintiff's claimed injuries.[87] The expert's report stated that housing the plaintiff:

in the male unit exposed her to harm which resulted in her self reported rape. Had [plaintiff] been housed in a safe and appropriate manner, given her propensity for sexual victimization, she would not have been placed in a male unit. By being housed in a male unit it was foreseeable that [plaintiff] would be exposed to and was at higher risk for the exact self reported harm which she suffered

**82.** *Van Ness*, 461 S.W.3d at 142 (citing *Jelinek*, 328 S.W.3d at 539–40); *see Jelinek*, 328 S.W.3d at 539–40 (expert report that "offer[ed] no more than a bare assertion that ... breach resulted in increased pain and suffering and a prolonged hospital stay[,]" with "no explanation of how the breach caused the injury[,]" was "conclusory on causation").

**83.** *Christus Spohn Health Sys. Corp. v. Hernandez*, 492 S.W.3d 819, 823 (Tex. App.–San Antonio 2016, no pet.) (expert's statement that plaintiff's "psychiatric problems [were] a direct result of, and were caused by [plaintiff] having been sexually abused by the [hospital] nurse" did not link hospital's alleged failures to plaintiff's injuries) (citations omitted); *see also Kingwood Pines Hosp., LLC*, 362 S.W.3d at 750 (expert's statements that proximate cause of molestation was hospital's failure to meet standard of care, that breaches of standard caused plaintiff's damages, and that " '[h]ad [plaintiff] and the other patients been properly supervised, [plaintiff] would not have been assaulted,' " failed to adequately describe causal relationship because it "provid-

ed no explanation regarding how and why these failures resulted in the alleged molestation").

**84.** *Payton*, 2015 WL 7422989, at *4–5, 2015 Tex. App. LEXIS 11818, at *11–12 (expert report, which stated, inter alia, that "[i]f [the patient] had been placed on adequate safety precautions, such as with the containment and/or supervision reasonably required given his past history, [plaintiff] would not have escorted him to the laundry room alone," was sufficient to show causal connection).

**85.** *Id.*, 2015 WL 7422989, at *4–5, 2015 Tex. App. LEXIS 11818, at *10–11 (quoting *Fung v. Fischer*, 365 S.W.3d 507, 530 (Tex. App.–Austin 2012, no pet.), *disapproved of on other grounds by Potts*, 392 S.W.3d at 627–32).

**86.** *Id.*, 2015 WL 7422989, at *4–5; 2015 Tex. App. LEXIS 11818, at *11 (citing *Hayes v. Carroll*, 314 S.W.3d 494, 507 (Tex. App.–Austin 2010, no pet.)).

**87.** *See* 281 S.W.3d at 213–15.

which was the assault she reported by a 16 year old male patient.[88]

The court concluded that the expert's report "identified the specific conduct of Timberlawn called into question by [the plaintiff] and provided a sufficient basis for the trial court to conclude the claim ha[d] merit." [89]

Gracy Woods contends that Dr. Lipson's report does not explain how its alleged failure to conduct hallway monitoring, or the alleged failure to move Rivera to a room closer to the nursing station, caused the alleged assault of Rivera. As discussed previously, Dr. Lipson's report describes a prior complaint that another resident had been sexually assaulted, and a prior complaint by Mahan that another male resident had made inappropriate advances towards her mother, which made it "foreseeable [that] assaults like this would occur without the proper precautions." Dr. Lipson describes the "reasonable precautions" that Gracy Woods allegedly should have taken—including twenty-four hour monitoring, regular checks, and moving Rivera to a room close to the nursing station—"to protect Ms. Rivera from the foreseeable consequences of her impairment[,] including sexual assault." Dr. Lipson states that these precautions were not taken, and Rivera was sexually assaulted, thereby rendering her "tearful and afraid . . . even after Ms. Rivera was removed from the facility." We cannot conclude that the trial court abused its discretion by determining that Dr. Lipson's report "represent[ed] an objective good faith effort to comply with the definition of an expert report," i.e., that the report "provide[d] a fair summary" of Dr. Lipson's opinions regarding the causal link between Gracy Woods's alleged breach and Rivera's alleged injuries.[90]

Gracy Woods also contends that Dr. Lipson's report is deficient because it "assumes that Ms. Rivera experienced sexual contact without excluding other, innocuous causes." Dr. Lipson endeavored to exclude various possible causes—other than a sexual assault of Rivera while she was at Gracy Woods—that might otherwise explain Rivera's vaginal injuries.[91] We need

**88.** *Id.* at 214. The expert report in *Timberlawn* additionally explained that, had Timberlawn not breached the applicable standard of care, the plaintiff "would not have been exposed to harm and/or victimization from male patients." *Id.* at 214 n.4; *see also Kim,* 399 S.W.3d at 719 (noting that, in *Timberlawn,* "[w]e concluded the plaintiff's expert report was sufficient in that it linked the breaches of the standard of care, the defendant's housing the female plaintiff in a male unit, to the harm she suffered, her self-reported rape" (citing *Timberlawn,* 281 S.W.3d at 214)).

**89.** *Timberlawn,* 281 S.W.3d at 214–15 (citing *Palacios,* 46 S.W.3d at 879); *see also Harrington,* 2015 WL 9001573, at *7, 2015 Tex. App. LEXIS 12683, at *21 ("We conclude the information in Dr. Lipson's report adequately discusses causation so as to inform [the defendant] of the conduct that [the plaintiffs] have called into question and to provide a basis for the trial court to conclude that [the plaintiffs']

claims have merit." (citing *Palacios,* 46 S.W.3d at 879)); *Christian Care Ctrs., Inc.,* 328 S.W.3d at 648 (expert report opining that, "though it was reasonably foreseeable" that nursing home resident "was a danger to himself or others," he was admitted to nursing home "and was not properly care for or supervised," and while unsupervised, resident injured plaintiff (a fellow resident) "by turning over her walker, leading to her death," articulated requisite "causal relationship").

**90.** Tex. Civ. Prac. & Rem. Code § 74.351(*l*), (r)(6); *see Payton,* 2015 WL 7422989, at *4–,5 2015 Tex.App. LEXIS 11818, at *10–12.

**91.** Dr. Lipson's report states:

I have considered other causes of this injury. I considered if the vaginal injuries were self-inflicted. There is no evidence in Ms. Rivera's chart to indicate she engaged in either sexual self-stimulation or self-abuse. I considered the injury may have been inflict-

not determine the sufficiency of Dr. Lipson's report as to this issue because, as noted previously, Dr. Lipson's report was not required to establish that Rivera was in fact sexually assaulted.[92]

## CONCLUSION

We conclude that the trial court did not abuse its discretion in determining that Dr. Lipson's report "represent[ed] an objective good faith effort to comply with the [statutory] definition of an expert report." We therefore affirm the trial court's order denying Gracy Woods's motion to dismiss.

ed by someone outside the facility or even a family member. There is no evidence to support this approach. There is no record the family was anything other than supportive. The timeline in the chart indicates she was [at] the facility at all relevant times save during transfer to the hospital. There is no evidence anyone sexually assaulted her when she was being transferred to the hospital to have her examined for injuries.

92. *See Timberlawn*, 281 S.W.3d at 211–13.