

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-20-00262-CV

———————————————————

JACKSBORO NURSING OPERATIONS, LLC, Appellant

V.

NADINE NORMAN, INDIVIDUALLY; AS THE REPRESENTATIVE OF THE
ESTATE OF ASHLEY NORMAN, DECEASED; AS NEXT FRIEND OF E.N.
AND J.L., MINORS; AND ON BEHALF OF ALL WRONGFUL DEATH
BENEFICIARIES, Appellee

---

On Appeal from the 271st District Court
Jack County, Texas
Trial Court No. 19-10-120

---

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

This is an appeal from the trial court's denial of a motion to dismiss a health care liability claim brought by Appellee Nadine Norman, individually; as the representative of the estate of Ashley Norman, deceased; as next friend of E.N. and J.L., minors; and on behalf of all wrongful-death beneficiaries (collectively Plaintiff). Appellant Jacksboro Nursing Operations, LLC d/b/a Faith Community Nursing & Rehabilitation (FCNR) raises five issues—all based on the contention that Plaintiff's failure to file an expert report meeting the requirements of the Texas Medical Liability Act (MLA) requires dismissal of the claim. We reject FCNR's contention that the expert authoring the report was unqualified to do so. We also reject FCNR's contentions (1) that the claim should be dismissed because the expert failed to state that there was a causal link between the injury he claimed that FCNR caused and the patient's death and (2) that the report failed to support a theory that FCNR was vicariously liable for the actions of its employees. An expert report need not substantiate every theory of liability that underlies a health care claim, and at this point, it is premature to hold that deficiencies in the report might warrant dismissal of the claim. We do, however, hold that the expert's report is deficient in one regard: it fails to adequately state what actions FCNR should have taken that would have avoided a breach of the standard of care it owed directly to Ashley. The remedy for this deficiency is not dismissal of the claim. Instead, we reverse the trial court's order

denying FCNR's motion to dismiss and remand this case to the trial court to determine whether a thirty-day extension should be granted to correct the deficiency.

## II. Factual and Procedural Background

Plaintiff filed suit against two Doe Defendants and FCNR.[1]  Without distinguishing whether the reference to "Defendants" is to the Doe Defendants, FCNR, or both, the "Facts" alleged in the petition are as follows:

> This lawsuit arises from the negligent care Ashley Norman received as a patient of Defendants.  On or about October 15, 2018, Ashley Norman was admitted into Defendants' facility.  It was Defendants' duty to provide Ashley with a level of reasonable care and to protect her by providing a safe environment.  Instead, the care provided by Defendants fell far below any acceptable standard of care, and Ashley, a beloved mother and daughter, suffered severe personal injuries due to the lack of care provided by Defendants.  Defendants' treatment of Ms. Norman was continuously tortious and resulted in her tragic and untimely death.

The petition continues that the Doe Defendants allegedly raped Ashley while she was a patient at FCNR.  Based on this act, Plaintiff's petition alleged causes of action against all the Defendants for sexual assault, false imprisonment, assault and battery, offensive physical contact, intentional infliction of emotional distress, and gross negligence.  Against FCNR, the petition alleged causes of action for negligence, negligent hiring, negligent training, negligent supervision, and negligent retention. The petition sought survival damages, which included Ashley's past physical pain and suffering and mental anguish.  Plaintiff, on her own behalf and on behalf of the

---

[1]The Doe Defendants are not parties to this appeal, and we assume that they remain defendants in the trial court.

3

minors for whom she acted as next friend, sought various forms of wrongful-death damages, such as pecuniary loss, loss of consortium, and mental anguish.

The parties entered into a Rule 11 agreement extending the time for Plaintiff to provide an expert report pursuant to Texas Civil Practice and Remedies Code Section 74.351. Plaintiff timely served an expert report authored by Dr. David A. Smith and Dr. Smith's curriculum vitae (CV).

In the discussion that follows, we will detail the provisions of Dr. Smith's report and his purported qualifications to author an expert report. But, in summary, the report claims that Ashley was thirty years of age and suffered from Multiple Sclerosis. At the time she was a patient at FCNR, she provided a urine sample that tested negative for any sexually transmitted disease. A test administered approximately one month after Ashley's admission and after she had been transferred to another facility and then transferred back to FCNR stated that she had contracted trichomonas. Dr. Smith described trichomonas as a sexually transmitted disease. Dr. Smith reported that notations in Ashley's medical records that he reviewed indicated "that the trichomonas was thought to be due to sexual contact that [had] occurred at FCNR."

Dr. Smith's report asserted that both Ashley's medical records that he reviewed and Ashley's statement to her mother (Plaintiff) showed that Ashley had been sexually assaulted while she was a patient at FCNR. The report outlined the standard of care that Dr. Smith opined was due a patient such as Ashley. The report also generally

outlined what Dr. Smith viewed as numerous breaches of the standard of care by the Doe Defendants who assaulted Ashley and breaches by FCNR's failure to investigate Ashley's outcries, to keep her safe, and to supervise its employees.

FCNR filed objections to Dr. Smith's report that challenged his qualifications to opine on the standard of care due Ashley and the alleged breaches of the standard of care by FCNR. FCNR also objected that the report failed to adequately address causation and injury and was conclusory in its description of how FCNR had breached the standard of care. The trial court overruled FCNR's objections. When FCNR filed a notice of appeal from the order denying its objections, we sent the parties a letter questioning whether an order denying objections made to an expert report but not overruling a motion to dismiss was an appealable interlocutory order.

FCNR then renewed the process of challenging Dr. Smith's report in the trial court by filing a new pleading titled "Defendant's Motion to Dismiss Under Section 74.351." This motion incorporated the prior pleadings that had been filed at the time that FCNR made its original objections. Plaintiff filed a response and an amended response to the motion to dismiss. The trial court denied the motion to dismiss.

III. Analysis

**A.** **We set forth the expert-report requirement that applies to a health care liability claimant, the substance that an expert report must contain, and the standard and scope of review that we apply to determine an expert report's sufficiency.**

"Chapter 74 of the Civil Practice and Remedies Code, also known as the [MLA], requires health care liability claimants to serve an expert report upon each defendant not later than 120 days after that defendant's answer is filed." *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a)). The report requirement functions "to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims." *Id.*

The MLA requires an expert report to

provide[] a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care[;] the manner in which the care rendered by the . . . health care provider failed to meet the standards[;] and the causal relationship between that failure and the injury, harm, or damages claimed.

Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6).

The test applied by the trial court in determining the sufficiency of the report is one of objective good faith. *Id.* § 74.351(*l*) ("A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good[-]faith effort to comply with the definition of an expert report in Subsection (r)(6)."). The Texas Supreme Court has

held that a good-faith effort occurs when a report "(1) inform[s] the defendant of the specific conduct called into question and (2) provid[es] a basis for the trial court to conclude the claims have merit." *Abshire* 563 S.W.3d at 223 (quoting *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018)).

Various general principles guide the determination of whether an expert report is sufficient. "A report 'need not marshal all the claimant's proof,' but 'a report that merely states the expert's conclusions about the standard of care, breach, and causation' is insufficient." *Id.* (quoting *Am. Transitional Care Ctrs. of Tex. v. Palacios*, 46 S.W.3d 873, 877 (Tex. 2001)). Nor does a report have to meet the standards of summary-judgment evidence. *Miller v. JSC Lake Highlands Operations*, 536 S.W.3d 510, 517 (Tex. 2017) ("We remain mindful that an 'adequate' expert report 'does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial.'" (quoting *Scoresby v. Santillan*, 346 S.W.3d 546, 556 n.60 (Tex. 2011))). Also, an expert report need not convince the reader that its conclusions are believable and reasonable. *See Abshire*, 563 S.W.3d at 226 (stating that at the "preliminary [expert-report] stage, whether th[e] standards [referenced in the report] appear reasonable is not relevant to the analysis of whether the expert's opinion constitutes a good-faith effort" (quoting *Miller*, 536 S.W.3d at 516–17)).

The following statutory provisions guide the determination of whether the expert making the report is qualified and whether the report adequately describes the applicable standard of care and explains causation:

- The MLA provides specific criteria to determine if the expert making a report is qualified. "'Expert' means[] with respect to a person giving opinion testimony regarding whether a health care provider departed from accepted standards of health care, an expert qualified to testify under the requirements of Section 74.402." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(B). In turn, Section 74.402 provides that

> [i]n a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:
>
> (1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;
>
> (2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and
>
> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

*Id.* § 74.402(b).[2]  In making the determination of whether an expert is qualified on the basis of training or experience, the trial court considers whether the witness

> (1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and
>
> (2) is actively practicing health care in rendering health care services relevant to the claim.

*Id.* § 74.402(c).

The expert's qualifications must appear in the report or in the CV and cannot be inferred.  *See Savaseniorcare Admin. Servs., L.L.C. v. Cantu*, No. 04-14-00329-CV, 2014 WL 5352093, at *2 (Tex. App.—San Antonio Oct. 22, 2014, no pet.) (mem. op.).

- "To adequately identify the standard of care, an expert report must set forth 'specific information about what the defendant should have done differently.'"  *Abshire*, 563 S.W.3d at 226 (quoting *Palacios*, 46 S.W.3d at 880).  "While the Act requires only a 'fair summary' of the standard of care and how it was breached, 'even a fair summary must set out what care was expected[] but not given.'"  *Id.*

---

[2]Subsection (1) of Section 74.402(b) applies only if the provider is an individual. *See Premieant Inc. v. Snowden ex rel. Snowden*, No. 04-19-00238-CV, 2020 WL 1159055, at *3 n.4 (Tex. App.—San Antonio Mar. 11, 2020, no pet.) (mem. op.).

- On the issue of causation, the report must "explain 'how and why' the alleged negligence caused the injury in question." *Id.* at 224. Conclusory descriptions of causation are not adequate; "the expert must explain the basis of his statements and link conclusions to specific facts." *Id.* But "[i]n satisfying th[e] 'how and why' requirement, the expert need not prove the entire case or account for every known fact; the report is sufficient if it makes 'a good-faith effort to explain, factually, how proximate cause is going to be proven.'" *Id.* (quoting *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017)). Further, "[t]he sufficiency of the expert report's causation statement should be viewed in the context of the entire report." *Columbia Med. Ctr. of Arlington Subsidiary L.P. v. L.M.*, No. 02-17-00147-CV, 2018 WL 1095746, at *7 (Tex. App.—Fort Worth Mar. 1, 2018, no pet.) (mem. op.). Finally, "the detail needed to establish a causal link generally is proportional to the complexity of the negligent act giving rise to the claim." *Id.* In other words, a "causation opinion is not conclusory simply because it is not complex." *Id.*

We apply an abuse-of-discretion standard to test the trial court's decision to grant or deny a motion to dismiss that challenges the adequacy of an expert report. *Abshire*, 563 S.W.3d at 223. The scope of our review is limited to "the information contained within the four corners of the report." *Id.*

10

**B.     Dr. Smith's report adequately states his qualifications.**

In its fourth issue, FCNR claims that Dr. Smith is not qualified to author an expert report on the standard of care that FCNR owed Ashley. Though Dr. Smith is a licensed physician, FCNR contends that his report and his CV fail to show within their four corners that he is familiar with the standard of care for a skilled nursing facility. The crux of the argument is as follows:

> In other words, it is familiarity with the care expected of the particular health care provider—not familiarity with how the expert would care for a similar patient in [his] field—which determines whether that expert is qualified. Dr. Smith did not establish that he is familiar with the standard of care of a skilled nursing facility in the context of this case. While he is a physician with experience treating patients such as Ms. Norman, he has not shown within the four corners of his report or [his] [CV] that he has experience or expertise with policies or procedures for security at a skilled nursing facility and indeed[] admitted that he had not even reviewed [FCNR]'s policies and procedures. Dr. Smith provided no qualification to opine on [FCNR]'s standard of care or alleged breach regarding negligent hiring, retention, supervision or vicarious liability. [Footnote omitted.]

FCNR's argument simply turns a blind eye to the qualifications that Dr. Smith listed in his report. His report establishes his qualifications to opine not only on the standard of care for a physician treating a patient such as Ashley but also on the standard of care for a health care provider such as FCNR.

Under the title "Professional Activities," Dr. Smith's report states,

> I am David A. Smith MD, CMD, a geriatrician in private practice in Brownwood[,] TX. For many years I practiced family medicine as an academic physician with special responsibilities in the areas of geriatrics, long[-]term care[,] and psychiatry. I am a Certified Medical Director (in Long[-]Term Care). At all relevant times I have been licensed to practice

11

medicine in the [S]tate of Texas.  I have been board certified by the American Board of Family Practice.  I previously held the Certificate of Added Qualifications in Geriatrics.  Since 1999[,] my practice is as a consulting geriatrician for community[-]dwelling elders, attending physician for long[-]term care residents[,] and as a Medical Director for several nursing homes.

In addition to my medical practice, as my [CV] reflects, I have been a Professor of Family & Community Medicine at Texas A&M University.  Prior to Texas A&M, I was a Professor with tenure teaching Family Medicine and Psychiatry at the University of South Dakota School of Medicine.

I am currently an Associate Editor for the Journal of American Medical Directors Association.  I was the Managing Editor of the Annual of Nursing Home Medicine and was on the Editorial Board for the Journal of Long[-]Term Care Administration.

Since 1981[,] I have been a member of the American Medical Directors Association (now AMDA:  Th[e] Society for Post-Acute and Long[-]Term Care).  I am also a member of the American Geriatrics Society, the Texas Medical Association, and the Texas Medical Directors Association.

I have worked in numerous healthcare and rehabilitation centers, including as the medical director[].  This includes prior experience as a regional medical director for a hospice organization[,] and[] therefore, I have experience in estimating life expectancy.

I have also been an integral part of many committees as more fully outlined in my CV.  I have received the Faye Smith Award for Excellence in Family Practice, been honored as a Pioneer in Development of Certification of Medical Directors of Nursing Homes, the Pattee Award for Excellence in Education[,] and AMDA:[ ]The Society for Post[-]Acute and Long[-]Term Care's Distinguished Service Award[].  I have been honored by . . . Adult Protective Service[s] reflecting a long and continuing history as a consultant to that [s]tate agency.

Since 1984[,] I have spent a large amount of time studying and gaining knowledge in my respective areas of practice and expertise and

12

have been published in numerous refereed medical journals and several medical textbooks, many of which are focused on areas related to nursing and rehabilitation, cognitive and psychiatric conditions, as well as ethical and legal issues. Furthermore, I have done presentations on these topics at over 115 professional meetings since 1992. The presentations have included topics such as nursing home resident[s'] rights, abuse, physician accountability, psychiatry in nursing homes, nursing[-]facility litigation and liability, and creating a culture of safety in long[-]term care.

Later in his report, Dr. Smith specifically states that he is familiar with the standard of care due Ashley in a nursing facility that provides the type of care that Ashley received:

I am very familiar with the relevant conditions experienced by Ashley Norman, to include her sexual assault, multiple sclerosis (MS), and trichomonas. More importantly, I have dedicated my life to treating people like Ashley Norman and am well aware of the standard of care required of physicians, nurses, and nursing facilities that provide treatment to patients with such conditions. Further, I am very familiar and experienced in reading and interpreting data related to a urinalysis.

In addition to being well acquainted with the medical conditions suffered by Ashley Norman, I also know the outcomes that can reasonably be expected in patients with such a condition that receive care at nursing and rehabilitation centers. I am also well aware of the expected outcomes and standard of care for patients in nursing and rehabilitation centers in general, regardless of any particular condition. These subjects are an inextricable part of my clinical practice and my academic activities.

It is my understanding that the standard of care is the same across the country for physicians, nurses, and facilities holding themselves out as qualified to treat or otherwise provide medical care to patients like Ashley Norman.

The paragraphs quoted above show Dr. Smith's qualifications not only as a physician but also as an administrator of health care providers like FCNR and reveal

13

that he is a Certified Medical Director.  Indeed, he indicates that he is the editor of the journal of the American Medical Directors Association.  The quoted paragraphs show much broader experience than merely being a physician who treats patients in facilities similar to FCNR.  But even without this broader experience, Dr. Smith notes that his medical practice involves the long-term care of patients.

Dealing with an argument similar to the one raised by FCNR challenging Dr. Smith's qualifications, the Austin Court of Appeals applied the standards of the MLA to determine whether a physician was qualified to opine about the standard of care owed by a nursing home to a dementia patient who was sexually assaulted.  *See Gracy Woods I Nursing Home v. Mahan*, 520 S.W.3d 171 (Tex. App.—Austin 2017, no pet.).  *Mahan* concluded that the physician in question had the necessary qualifications to make an expert report on the nursing home's standard of care.  *Id.* at 181, 186.  Summarizing the standards of the MLA, *Mahan* posed the following test to determine whether a physician who authored an expert report on the nursing home's standard of care was qualified:

> This case, at its core, concerns the standards of care applicable to nursing homes in order to protect patients from harming each other. Thus, [the physician's] report and CV must articulate a factual basis that sufficiently demonstrates (1) his "knowledge of [the] accepted standards of care" applicable to nursing homes, and (2) his qualifications "on the basis of training or experience to offer an expert opinion regarding [these] accepted standards," *e.g.*, his relevant licensing certifications, his "other substantial training or experience," and his "actively practicing health care in rendering health care services relevant to the claim."

14

*Id.* at 183–84 (quoting Tex. Civ. Prac. & Rem. Code Ann. § 74.402(b)(2), (b)(3), (c)(1), (c)(2)) (footnotes omitted). The Austin Court of Appeals concluded that the physician was qualified to opine on a nursing home's standard of care. *Id.* at 181, 186. The court looked to such experience and training as the doctor's certification in geriatric medicine, his treatment of patients in long-term care, his experience as a professor of geriatrics and as a consultant for government agencies regarding nursing home operations, and his lectures on relevant topics. *Id.* at 185–86.

Here, Dr. Smith's report and CV show that he has training and experience beyond what the Austin Court of Appeals determined was necessary to be qualified as a physician to offer an opinion on a nursing home's standard of care. Dr. Smith is not only a physician who had treated patients in a long-term care setting, but he also had actually been employed as an administrator of those type of facilities and wrote and lectured on the administration of such facilities. Dr. Smith also notes the "special responsibilities" of his medical practice in the field of long-term care. Specifically, he catalogs his experience, including his service as an attending physician for long-term-care patients; his service as a medical director in several nursing homes; his service as editor of several journals that address medical directors, nursing homes, and long-term care; his recognition in developing the certification for medical directors of nursing homes; and his publication on nursing home patients' rights and how to create a culture of safety for long-term care patients. Dr. Smith specifically states in his report that he has "dedicated [his] life to treating people like Ashley" and is "well

15

aware of the standard of care required of physicians, nurses, and nursing facilities that provide treatment to patients with such conditions."

The case that FCNR relies on to argue that Dr. Smith is unqualified fails to support its argument. FCNR relies on *Tawa v. Gentry* and its holding that a physician cannot testify about the standard of care of health care providers unless the expert has knowledge of the standards or has worked with or supervised such health care providers. No. 01-12-00407-CV, 2013 WL 1694869, at *13 (Tex. App.—Houston [1st Dist.] Apr. 18, 2013, no pet.) (mem. op.). The holding of *Tawa* states a truism, just not one applicable to Dr. Smith's report in view of his statements that he is aware of the standard of care and the experience his report catalogs to substantiate that claim. *See Methodist Health Ctrs. v. Crawford*, No. 01-14-00291-CV, 2014 WL 5500492, at *3 (Tex. App.—Houston [1st Dist.] Oct. 30, 2014, no pet.) (mem. op.) (distinguishing *Tawa* and holding expert sufficiently stated his qualifications when he said that he understood "not just what the standard of care requires[] but also what is likely to occur if the standard of care is not met" and made specific references to the applicable standard of care).

Accordingly, we hold that Dr. Smith is qualified to author an expert report on the standard of care that FCNR owed Ashley. We therefore overrule FCNR's fourth issue.

**C.** **The suit should not be dismissed at this point for the failure of Dr. Smith's report to state that a breach of the standard of care caused Ashley's death.**

In its fifth issue, FCNR argues that Dr. Smith's report is deficient because it fails to "provide any meaningful discussion of medical causation or how any alleged breach in the standard of care proximately caused an injury to [Ashley], much less 'resulted in her tragic and untimely death.'" The main focus of the argument is that the report fails to identify Ashley's cause of death or link her death to FCNR's breach of the standard of care. In a later portion of this opinion, we will hold that Dr. Smith's report is deficient in its statements regarding how FCNR breached the standard of care and will reverse and remand this case to the trial court. But to the extent that FCNR asks us to immediately dismiss the wrongful-death claim because Dr. Smith's report does not state how FCNR's action caused Ashley's death, we will not do so. As explained below, a report is tested by whether it is adequate as to one—instead of every—theory of recovery alleged. Here, the report is adequate if it can be amended to support the survival claim alleged, and we will not dismiss the wrongful-death claim before there is an opportunity to correct present deficiencies in the report that would make the report sufficient as to one theory of recovery.

The Texas Supreme Court was clear in *Certified EMS, Inc. v. Potts* that an expert report meets the requirements of the MLA if the report supports at least one theory of recovery. 392 S.W.3d 625, 630 (Tex. 2013). In *Potts*, the question was whether a report that supported a theory of vicarious liability was an adequate report to avoid

17

dismissal of the health care liability claim when the report did not support an additional pleaded theory of direct liability of the health care provider. *Id.* at 627.

The Texas Supreme Court offered its own straightforward rationale for holding that a report need only support one theory: the MLA does not require a report to support each theory alleged but to support the existence of a "health care liability claim." *Id.* at 630. Succinctly, the Texas Supreme Court held that a report that satisfies the requirements, "even if as to one theory only, entitles the claimant to proceed with a suit against the physician or health care provider." *Id.* When a report supports one theory of liability, the dual purposes of the MLA have been served: the report tells the defendant what conduct has been called into question and provides the trial court with the assurance that the claim has merit. *Id.* In the Texas Supreme Court's view, requiring a report to support only one theory of recovery also satisfies the legislative intent of the MLA by deterring baseless claims but not blocking earnest ones. *Id.* at 631. Further, a rule requiring an expert report to support each theory would ensnare the courts in satellite litigation and use a mechanism that is ill-suited to resolve the viability of subsets of liability theories that may be later honed by discovery and better tested by summary-judgment motions or trial. *Id.* at 632.

Both our court and the First Court of Appeals have applied *Potts* to a situation similar to the one encountered in this case. In *Bay Oaks* and *Ince*, a health care liability claimant alleged both survival and wrongful-death claims, but the expert report did

not tie the breach of the standard of care to the patient's death.[3] *See Bay Oaks SNF, LLC v. Lancaster*, 555 S.W.3d 268, 278–84 (Tex. App.—Houston [1st Dist.] 2018, pet. denied); *SCC Partners, Inc. v. Ince*, 496 S.W.3d 111, 114–15 (Tex. App.—Fort Worth 2016, pet. dism'd). In *Bay Oaks*, the defendant sought dismissal of a wrongful-death claim because the expert report did not link the patient's death to the injury described in the report or opine as to a cause of death. 555 S.W.3d at 278. In *Ince*, we confronted a similar argument. 496 S.W.3d at 114. Both *Bay Oaks* and *Ince* applied *Potts*'s holding to reject the argument that the wrongful-death claim should be dismissed. In essence, both opinions held that when a report is adequate to sustain the survival claim, the purpose of the MLA is served, even though the report failed to address the basis for the wrongful-death claim. Thus, if Plaintiff filed an adequate report to support the claim of a breach of the standard of Ashley's care and her

---

[3]The distinction between survival claims and wrongful-death claims is as follows: Survival claims result from Texas Civil Practice and Remedies Code Section 71.021, which provides that a claim for injury to a person's health does not abate on death and may be prosecuted by "heirs, legal representatives, and the estate of the injured person." Tex. Civ. Prac. & Rem. Code Ann. § 71.021(a), (b). A wrongful-death claim is generally covered by the Texas Wrongful Death Act, and "damages recoverable in a wrongful[-]death action are for the exclusive benefit of the defined statutory beneficiaries and are meant to compensate them for their own personal loss." *Cunningham v. Haroona*, 382 S.W.3d 492, 508 (Tex. App.—Fort Worth 2012, pet. denied) (citing Tex. Civ. Prac. & Rem. Code Ann. § 71.002, defining wrongful-death cause of action). "Damages recoverable by the statutory beneficiaries under the Wrongful Death Act include pecuniary losses to the beneficiaries, such as loss of inheritance and non-economic damages to compensate for the losses caused by the destruction of the familial relationship." *Id.*

survival claim, then the report need not go further and support the wrongful-death claim to avoid dismissal.

Accordingly, we overrule FCNR's fifth issue.

**D. The suit should not be dismissed, at this point, for the failure of Dr. Smith's report to state a basis for FCNR to be held both directly and vicariously liable for the claims made for the assault against Ashley.**

In its first and second issues, FCNR challenges Dr. Smith's report because it allegedly "lumps" all potentially culpable parties into one group and provides no basis for the reader to conclude that FCNR is liable for the intentional acts of the persons who allegedly abused Ashley. In essence, FCNR argues that Dr. Smith's report fails to adequately document that it is either vicariously or directly liable. FCNR once again simply ignores the provisions of Dr. Smith's report that undermine its argument and the impact of the rule enunciated in *Potts* (which we have just discussed)—that a report need support only a single theory of liability. As noted, we are remanding this matter for the trial court to determine whether to grant an extension for Plaintiff to file an amended report addressing how FCNR breached the standard of care it owed directly to Ashley. If an amended report adequately documents that theory, then the report will meet the *Potts* standard by supporting at least one theory of liability.

FCNR begins its argument by citing cases that stand for the proposition that a report "may not assert that multiple defendants are all negligent for failing to meet the standard of care without providing an explanation of how each defendant specifically

breached the standard [of care] and how that breach caused or contributed to the cause of injury." *See, e.g., Taylor v. Christus Spohn Health Sys. Corp.*, 169 S.W.3d 241, 244 (Tex. App.—Corpus Christi–Edinburg 2004, no pet.). Its argument then pivots to contend that an assault committed by an employee is outside the scope of the employee's employment duties and that the employer is not vicariously liable for those acts. *See NCED Mental Health, Inc. v. Kidd*, 214 S.W.3d 28, 34 n.8 (Tex. App.—El Paso 2006, no pet.); *Buck v. Blum*, 130 S.W.3d 285, 288 (Tex. App.—Houston [14th Dist.] 2004, no pet.). With these two premises in place, FCNR argues that

> Texas law is clear that an employer cannot be held vicariously liable for sexual assaults allegedly committed by its employees because such actions are not within the course and scope of employment. If such a claim has no merit under the law, an expert report premised on this same meritless theory is inadequate. The entire purpose of Chapter 74.351 is to serve as a gatekeeping function so the trial court can form a basis to conclude that the claim has merit. The Smith Report is fatally deficient because it attributes the alleged criminal sexual assault [by] two alleged employees to their . . . employer.

But as we have discussed, *Potts* held that a report need only be sufficient to support one theory of liability. 392 S.W.3d at 630. In *Potts*, the report supported a theory of vicarious liability and was sufficient to avoid dismissal of the suit even though it did not support a theory of direct liability. *Id.* Logically, the converse is also true: when an expert report supports a theory of direct liability for negligence, it is sufficient even though it does not support a theory of vicarious liability.

FCNR does not discuss *Potts*. Instead, FCNR appears to argue that Dr. Smith's statements directed to FCNR's direct liability for a breach of the standard of care are

21

deficient because "[t]he remaining claims of breach made by Dr. Smith . . . are so broad as to be no opinion at all and, therefore, inadequate." The argument then quotes brief snippets from the report and concludes that "[b]ecause these alleged breaches are not specific and [are] not tied to the facts of the case, the Smith Report is inadequate." This argument is simply a short form of FCNR's argument that Dr. Smith's report is conclusory on whether FCNR breached the standard of care—the issue that we will discuss next.[4] Again, as we discuss below, we are remanding this

---

[4]In both its opening brief and its reply brief, FCNR challenges Dr. Smith's report because he does not detail how Ashley was allegedly assaulted and posits a rhetorical question: "Worse yet, the alleged employees [who allegedly assaulted Ashley] remain unidentified, and the other details of the alleged assault, including when and where it happened, remain a mystery. Surely such an expert report based on no facts cannot form the basis for a viable Chapter 74 report?" The Dallas and Austin Courts of Appeals have rejected the premise of FCNR's rhetorical question intimating that a report must outline the details of the assault. *See Mahan*, 520 S.W.3d at 177–81; *UHS of Timberlawn, Inc. v. S.B. ex rel. A.B.*, 281 S.W.3d 207, 212 (Tex. App.—Dallas 2009, pet. denied). As the Austin Court of Appeals explained,

> [T]he statute required [the physician's] report to provide "a fair summary" of his opinions regarding the requisite causal link, and the report was deficient only if it "[did] not represent an objective good[-]faith effort to comply with" this requirement, i.e., if it did not inform [the nursing home] of the specific conduct called into question and provide a basis for the trial court to conclude that [the patient's representative's] claims had merit. *In the context of this case, in which the alleged "harm" or "injury" was a sexual assault (which is not itself a medical condition and for which medically ascertainable evidence may not even exist), we conclude that [the physician's] report need not establish the fact of the assault itself in order to constitute a "good-faith" effort to provide "a fair summary" of [the physician's] opinions regarding the causal link between [the nursing home's] alleged breach and [the patient's] alleged injury.*

22

matter to allow the trial court to decide whether an amended report may be filed. Should that report be sufficient to establish the direct liability of FCNR, Plaintiff will satisfy her obligation to present a report establishing a health care liability claim. Thus, it is premature to deal with the argument that we should hold that the claim should be dismissed because it fails to support a theory of vicarious liability. We therefore overrule FCNR's first and second issues.

### E. Dr. Smith's report is deficient in its statement that FCNR breached the standard of care.

We turn to what is the crux of this appeal: FCNR's attack in its third issue that Dr. Smith's report fails to sufficiently describe how FCNR breached the standard of care due Ashley. We agree with FCNR that Dr. Smith's report is deficient in its statements that there was a breach of the standard of care. We also conclude that the report is merely deficient instead of being no report at all. Thus, we will reverse the trial court's order denying the motion to dismiss and remand this matter to the trial

---

*Mahan*, 520 S.W.3d at 180–81 (emphasis added) (footnotes omitted). *Mahan* establishes that FCNR's premise that Dr. Smith's report had to document how the assault occurred is flawed. Here, Dr. Smith's report goes further than the one in *Mahan* and actually describes the disease that Ashley allegedly contracted from the sexual assault. Further, the report documents what Dr. Smith relied on to establish that an assault occurred: Plaintiff stated "that Ashley complained that she was raped numerous times by two men [who] worked at FCNR." The report also states that the records that Dr. Smith reviewed had "notations that Ashley was reported to have experienced multiple episodes of sexual assault at FCNR by FCNR employees." Again, a report is not challengeable because it is not believable or reasonable; if the assault did not occur, that issue can be litigated in the appropriate context of a motion for summary judgment.

23

court for it to determine whether to grant Plaintiff a thirty-day extension to cure the report's deficiencies.

We have outlined that a report must make only a good-faith effort to explain how and why the alleged negligence caused the injury in question. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*). Again, the report need not prove the entire case or account for every known fact. *See Abshire*, 563 S.W.3d at 224.

But no matter how simply stated the underlying rule may be, its application to specific cases involving the sexual assault of a patient has produced inconsistent results. The Corpus Christi–Edinburg Court of Appeals concluded that a report was adequate when, in essence, the report stated that a health care provider had failed to adequately protect and provide safety to a patient. *See Christus Spohn Health Sys. Corp. v. Sanchez*, 299 S.W.3d 868, 878 (Tex. App.—Corpus Christi–Edinburg 2009, pet. denied). The Texarkana Court of Appeals viewed the holding from the Corpus Christi–Edinburg Court of Appeals as being close to the line of what was permissible and contrasted that holding with those of our court and the Fourteenth Court of Appeals that found a report inadequate when it did not take an extra step of describing what the health care provider should have done, but did not do, to carry out the requirements of the standard of care. *See Texarkana Nursing & Healthcare Ctr., LLC v. Lyle*, 388 S.W.3d 314, 318–22 (Tex. App.—Texarkana 2012, no pet.) (discussing *Kingwood Pines Hosp., LLC v. Gomez*, 362 S.W.3d 740, 750 (Tex. App.—Houston [14th Dist.] 2011, no pet.), and *Baylor All Saints Med. Ctr. v. Martin*, 340

S.W.3d 529, 534 (Tex. App.—Fort Worth 2011, no pet.)). The Texarkana Court of Appeals asked "how much detail is needed in order for an expert report to withstand Chapter 74 scrutiny when the harm alleged arises from assaultive conduct," and it concluded that the report it reviewed was inadequate because the report failed to articulate what should have been done differently to prevent the assault. *Id.* at 320–22.

The Austin Court of Appeals crystalized the different approaches as to how an expert report must describe causation for a health care liability claim based on sexual assault as follows:

> In cases against health care providers arising from the alleged failure to prevent an assault, our sister courts have held expert reports deficient if they merely state that the provider "failed to provide a safe and secure environment" without any indication of what the facility "should have done differently to prevent the assault." On the other hand, this Court has held that an expert report is sufficient if it specifies what the defendant "should have done" and what it "should have done differently."

*Mahan*, 520 S.W.3d at 187 (footnotes omitted); *see also Tex. San Marcos Treatment Ctr., L.P. v. Payton*, No. 03-14-00726-CV, 2015 WL 7422989, at *3–4 (Tex. App.—Austin Nov. 18, 2015, no pet.) (mem. op.) (holding report adequate because it set out standard and described what health care provider should have done but did not do to meet standard).

Following the holding of our court and of our sister courts holding similarly, we conclude that an expert report is deficient if it merely states the conclusion that the

25

health care provider failed to protect a patient in violation of the standard of care without some indication of what the provider should have done differently. Dr. Smith's report fails to adequately take this second step.

We concede that the section of Dr. Smith's report dealing with the breach of the standard of care is lengthy, but as we will explain, irrespective of its length, the report is inadequate:

> My opinion is that John Doe, Richard Roe, Dr. Robert Cooper,[5] and FCNR, each breached the required standards of care applicable to the treatment of Ashley Norman, and that such breaches of the standard of care were the proximate causes of the sexual assault, trichomonas, and consequential pain and suffering experienced by Ashley.
>
> The standard of care demands that physicians, nurses, staff, and nursing facilities refrain from having any sexual contact with a patient, whether or not such contact is consensual. This standard of care was breached by FCNR, John Doe, and Richard Roe when John Doe and Richard Roe engaged in sexual intercourse with Ashley Norman. Ashley Norman was a patient[,] and the standard of care does not permit any sexual contact with caregivers, regardless of cognitive functioning or the ability to consent.
>
> The standard of care demands that physicians, nurses, staff, and all nursing facilities must promote care for residents in a manner and in an environment that maintains and enhances each resident's dignity and respect in full recognition of the patient's individuality. FCNR, John Doe, and Richard Roe breached this standard of care when Ashley Norman was sexually assaulted by John Doe and Richard Roe. This standard was further breached when Ashley's screams to stop were ignored by John Doe and Richard Roe. The decision, not only to engage in sexual intercourse[] but [also] to restrain Ashley and force her to engage in sexual intercourse[,] is the opposite of enhancing the residence's [sic] dignity and respect of the patient's individuality. John

---

[5]This reference to Dr. Robert Cooper is the only one that appears in the appellate record. We have no idea of what role, if any, Dr. Cooper plays in this claim.

Doe, Richard Roe, and FCNR took away Ashley's right to refuse sexual contact and forced her to endure the sexual assault on multiple occasions.

The standard of care for physicians, nurses, and nursing facilities requires that when a patient makes an allegation of sexual assault, the authorities should be contacted[,] and safety measures should be taken to ensure that no subsequent assault occurs. The standard of care requires any staff receiving the allegation of sexual assault (no matter how credible or not credible) to report to the designated Abuse Coordinator. In most facilities[,] this is the Administrator. [The] [s]tandard of care additionally requires suspension of any accused individual until an investigation is completed. Not to do this provides perpetrators the opportunity to "pollute" the investigation as well as exposing others to potential victimization. On the other hand, it protects those falsely accused by [e]nsuring a rigorous and high[-]quality investigation.

The standard of care also requires that an investigation be performed to determine the facts surrounding the sexual assault, such as how it occurred and who is responsible. The standard of care requires safety measures be taken to ensure the patient's safety.

This standard of care was breached when FCNR ignored Ashley's accusations of sexual assault and instead chose to do nothing. This standard of care was also breached when no investigation occurred and no additional safety measures were taken, such as increased security, increased supervision, and prohibiting male contact with Ashley. The standard of care requires that the patient's safety be the number one priority. This was breached not only when Ashley was sexually assaulted[] but [also] when FCNR chose not to take any safety precautions after the initial accusation and allowed subsequent sexual assaults to occur.

As a volunteer member of the Texas Department of Aging and Disability Services: Nursing Facility Administrators Advisory Committee from 2012–2016, I recall our committee sanctioning numerous [N]ursing Facility Administrators functioning as Abuse Coordinators for failing to investigate various allegations of abuse regardless of the credibility of the allegation.

27

Obviously, the standard of care for any healthcare provider requires that they not sexually assault a patient. This standard of care was breached when John Doe and Richard Roe held down Ashley Norman and forced her to engage in sexual intercourse against her will after she refused to do so willingly.

It is also important to note that Ashley Norman suffered from MS and numerous cognitive deficiencies which would render her mentally incapacitated and unable to consent to sexual contact, further magnifying the breach. As my CV reflects, I have authored . . . a medical textbook on the subject of determining mental capacity[,] and I frequently perform these assessments for Texas Adult Protective Services and as a consultant to other physicians. In my opinion, Ashley was not able to give consent to have sexual intercourse. The standard of care required FCNR to ensure [that] no person, staff or otherwise, was permitted to have sexual intercourse with Ashley.

FCNR also breached the standard of care when it failed to adequately supervise its employees and provide Ashley Norman with a safe environment. Further, the standard of care requires that a patient receive supervision so as to ensure the patient's safety and to ensure at the absolute least that the patient is not permitted to be sexually assaulted on numerous occasions. By allowing the initial sexual assault[,] FCNR clearly breached the standard of care by failing to provide adequate supervision. If it had, John Doe and Richard Roe would not have been allowed to be alone with Ashley and hold her down and sexually assault her on numerous occasions. The actions of FCNR appear to establish a pattern of conscious indifference to patient safety involving cover-up and have fallen well below the required standard of care by allowing any additional sexual assaults. After notification of the allegation, FCNR staff with this knowledge became accessories after the fact in my opinion as a physician (not a lawyer).

Sorting through these paragraphs, several themes emerge. First, many of the paragraphs are directed against the Doe Defendants and stand for the obvious proposition that no persons should be sexually assaulted. That proposition provides

no indication of how FCNR breached a standard of care that it owed directly to Ashley.

Many of the paragraphs deal with the failure of FCNR to adequately investigate what happened to Ashley. As a general proposition, whether FCNR adequately investigated what allegedly occurred is of doubtful relevance in and of itself. A failure to investigate after the assault would not have prevented an assault. The report notes that Plaintiff "stated that Ashley had informed two nurses of the assault[] but that FCNR did not take any action to prevent additional assaults and that she continued to be sexually assaulted." The report concludes that

> [t]his standard of care was breached when FCNR ignored Ashley's accusations of sexual assault and instead chose to do nothing. This standard of care was also breached when no investigation occurred and no additional safety measures were taken, such as increased security, increased supervision, and prohibiting male contact with Ashley.

But what the report lacks is some indication of why the actions or policies of a health care provider, such as FCNR, breached the standard of care and caused the continued assaults. The reader is not told what FCNR should have done differently to ensure that reports to the nurses were processed in a way that would have prevented additional assaults of Ashley.

When the report reaches the point of describing how FCNR breached the standard of care in the concluding paragraph of the paragraphs that we quoted, it, in essence, repeats the same proposition in several sentences: FCNR's acts of failing to supervise its employees and failing to ensure patient safety allowed Ashley to be

sexually assaulted. But these sentences lack what the report should contain—a description of what FCNR should have done differently. Though the report references that FCNR should have provided additional or increased measures, those general statements, again, fail to state what specific steps should have been taken.

The report does highlight one thing that FCNR should have done differently, which is taking the step of not permitting males to be in Ashley's room. The problem is that the report has a paragraph that, though it is a muddle, can be read to suggest that FCNR did take this step. The paragraph states that

> [t]here are also notations that Ashley was reported to have experienced multiple episodes of sexual assault at FCNR by FCNR employees. Importantly, it was also noted in numerous locations that Ashley did not want any males present and [that] she only wanted female RNs and PCTs. It appears that the facility complied with this as there are notations of "females only" within the records.

The reader is left to guess whether the "facility" referred to is FCNR or one of the other facilities referenced in the report as places where Ashley received treatment. Certainly, even if FCNR took the step of complying with Ashley's request but delayed doing so after her outcries, leading to additional assaults, there might be an indication of causation, but the report does not say this.

Dr. Smith's report is deficient because it is conclusory. For a sexual-assault-of-a-patient claim, a report must describe what the health care provider should have done to forestall an assault, or it does not serve the purpose of ensuring that only

30

meritorious health care claims survive dismissal. Accordingly, we sustain FCNR's third issue.

**F.** **We remand this claim to the trial court to determine whether Plaintiff should receive a thirty-day extension to cure the deficiencies in Dr. Smith's report.**

Having concluded that Dr. Smith's report is deficient in its description of how FCNR breached the standard of care, we turn to the question of whether to remand this matter to the trial court to decide whether to grant a thirty-day extension to allow Plaintiff to correct the deficiency. Dr. Smith's report falls well within the standard to grant such relief because his report is merely deficient rather than being no report at all.

The MLA provides that "[i]f an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient, the court may grant one 30-day extension to the claimant in order to cure the deficiency." *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c). The Texas Supreme Court has held that minimal standards apply that allow a party to be able to invoke the extension provision. *See Scoresby*, 346 S.W.3d at 557. Under that standard, "a thirty-day extension to cure deficiencies in an expert report may be granted if the report is served by the statutory deadline, if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated." *Id.* In applying the standard, a fundamental question is whether the deficiency in the report is curable, i.e., does it appear impossible for the deficiency to be cured.

31

*Zamarripa*, 526 S.W.3d at 461 n.37. As our court has described the distinction, "[t]he Act distinguishes between situations where a report is timely served but deficient and those where no report is served." *See Mitchell v. Swanson*, No. 02-19-00460-CV, 2020 WL 6065986, at *5 (Tex. App.—Fort Worth Oct. 15, 2020, no pet.) (mem. op.) (citing *Taton v. Taylor*, No. 02-18-00373-CV, 2019 WL 2635568, at *8–9 (Tex. App.—Fort Worth June 27, 2019, no pet.) (mem. op.)).

When a report meets the minimal standard that accords a party the opportunity to cure its deficiencies, "we generally 'do not render' judgment; instead, we usually 'remand for the trial court to consider whether to grant a thirty-day extension.'" *Id.* (quoting *UHP, LP v. Krella*, No. 02-19-00136-CV, 2019 WL 3756203, at *1 (Tex. App.—Fort Worth Aug. 8, 2019, no pet.) (per curiam) (mem. op.)).

Dr. Smith's report meets the standards that prompt us to remand this matter to the trial court to determine whether to grant a thirty-day extension. There is no question that Dr. Smith's report was timely served. And we have already concluded that the report and Dr. Smith's CV adequately stated his qualifications.

On the question of whether Dr. Smith's report implicated FCNR, we look to an opinion from the San Antonio Court of Appeals for guidance. That court held, in a case remarkably similar to this one, that a trial court abused its discretion by refusing a thirty-day extension. *See Hernandez v. Christus Spohn Health Sys. Corp.*, No. 04-14-00091-CV, 2015 WL 704721, at *4 (Tex. App.—San Antonio Feb. 18, 2015, no pet.) (mem. op.). In *Hernandez*, the plaintiff alleged that a sexual assault had occurred in an

emergency room. The expert report filed in *Hernandez* stated that the hospital had failed to address sexual assault outcries and to protect patients from predatory sexual conduct once the conduct had been reported. *Id.* at *4. *Hernandez* concluded that the expert report failed to adequately address causation but implicated the health care provider and was potentially curable:

> Although we agree that the report is deficient with regard to causation, as previously noted, "the causal relationship the plaintiff must show may not always be so clear." *Kim*[ *v. Hoyt*, 399 S.W.3d 714,] 718 [(Tex. App.—Dallas 2013, pet. denied).] *The report does state that "the patient's right to be protected in a vulnerable time of illness was not provided to Mrs. Hernandez," which implies that Hernandez was injured due to the absence of the requisite protection.* This is similar to the Texas Supreme Court's review of the expert report in *Scoresby*, in which the court noted that the report "did not state the standard of care but only implied that it was inconsistent with the Physicians' conduct." 346 S.W.3d at 557. Despite this deficiency, the Texas Supreme Court held the report was curable. [*Id.*] at 549; *see also Wooten v. Samlowski*, 282 S.W.3d 82, 90–91 (Tex. App.—Waco 2008), *aff'd as modified*, 332 S.W.3d 404 (Tex. 2011) (holding trial court abused its discretion in denying extension where report was deficient only because of an inadequate causal link).

*Id.* (emphasis added).

Though Dr. Smith's report is deficient, his report certainly implicates the conduct of FCNR as strongly, if not more so, than the report in *Hernandez*. Further, the nature of the deficiency does not indicate that it will be impossible to cure. Thus, the trial court should decide whether to grant an extension to allow Plaintiff to attempt to cure the deficiency.

33

## IV. Conclusion

Having overruled FCNR's first, second, fourth, and fifth issues but having sustained its third issue, we reverse the trial court's order denying FCNR's motion to dismiss and remand this case to the trial court for it to determine whether to grant a thirty-day extension pursuant to Texas Civil Practice and Remedies Code Section 74.351(c).

/s/ Dabney Bassel
Dabney Bassel
Justice

Delivered: April 15, 2021